UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MICHAEL BEHRENDSEN, Individually and
on behalf of all others similarly situated,

        Plaintiff,

    v.

YANGTZE RIVER PORT AND LOGISTICS
LIMITED, XIANGYAO LIU, XIN ZHENG,
and TSZ-KIT CHAN,

        Defendants.

Case No.: 1-19-cv-00024-DLI-LB

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
THE AMENDED CLASS ACTION COMPLAINT**

PHILLIPSON & URETSKY, LLP
Jonathan Uretsky
Faun M. Phillipson
111 Broadway, 8th Floor
New York, New York 10006
T: (212) 571-1164
uretsky@pullp.com
phillipson@pullp.com

*Counsel for Defendants*

# TABLE OF CONTENTS

*PRELIMINARY STATEMENT* ..................................................................................................... *1*

*LEGAL STANDARD* ................................................................................................................. *3*

    **A.   Rule 12(b)(6) Motions to Dismiss** .................................................................... **3**

    **B.   Elements To Be Plead Under Section 10(b) and Rule 10b-5.** ......................... **4**

    **C.   Heightened Pleading Standard.** ...................................................................... **4**

*ARGUMENT* ............................................................................................................................. *4*

    **A.  Plaintiff Has Not -- and Cannot -- Plead Loss Causation.** .............................. **4**

        i.  Plaintiff's Vague Allusion to Loss Causation is Not Enough. ........................... 6

        ii.  Plaintiffs' Alleged Grounds for Loss Causation are Inherently Flawed ........................... 9

        iii.  The Pingtan Marine Case ................................................................................ 11

    **B.  The Amended Complaint Fails to Allege Actionable Misstatements or Omissions.** .... **11**

        i.  Allegations Regarding Financial Statements Are Not Plead Properly. ........................... 12

        ii.  Management Expectations Were Forward-Looking and Accompanied by Cautionary Language. ................................................................................................. 13

    **C.  All Allegations Regarding the April 17, 2017 Press Release Should be Dismissed.** ..... **18**

    **D.  Plaintiff Has Not Properly Plead the Element of Scienter.** .......................... **19**

        i.  No Particularity with Regard to the Individual Defendants. ........................... 20

        ii.  No Conscious Misbehavior Has Been Alleged. ................................................ 22

        iii.  No Motive Has Been Alleged. ....................................................................... 22

    **E.  The Alleged Violations of Section 20(a) for "Control Person Liability" Against the** . **23**

    **Individual Defendants Should be Dismissed.** ...................................................... **23**

*CONCLUSION* ....................................................................................................................... *24*

# TABLE OF AUTHORITIES

## CASES

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007) ................................ 19, 23

Boguslavsky v. Kaplan, 159 F.3d 715 (2d Cir. 1998) .................................................................... 23

Desyatnikov v. Credit Suisse Group, Inc., 2012 WL 1019990 (E.D.N.Y. 2012)............. 19, 20, 21

Dura Pharms., Inc. v. Broudo, 544 U.S. 336 S.Ct. 1627, 161 L.Ed.2d 577 (2005)....................... 4

First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763 (2d Cir. 1994).............................. 8,10

Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC, 376 F.Supp.2d 443 (S.D.N.Y. 2005) ............................................................................................................................... 13

Ganino v. Citizens Utils. Co., 228 F.3d 154 (2d Cir. 2000) ......................................................... 19

Harris v. AmTrust Fin. Servs., Inc., 135 F.Supp.3d 155 (S.D.N.Y. 2015)................................... 13

In re AstraZeneca Sec. Litig., 559 F.Supp.2d 453 (S.D.N.Y. 2008) ........................................... 20

In re BISYS Sec. Litig., 397 F.Supp.2d 430 (S.D.N.Y. 2005) ..................................................... 20

In re Citigroup, Inc. Sec. Litig., 330 F.Supp.2d 367 (S.D.N.Y. 2004) ........................................ 22

In re Fannie Mae 2008 Sec. Litig., 742 F. Supp. 2d 382 (S.D.N.Y. 2010)................................... 10

In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29 (2d Cir. 2009) ................................... 5

In re Global Brokerage, Inc., 2019 WL 1428395 at *17, Fed. Sec. L. Rep. P. 100 (S.D.N.Y. 3/28/2019) ....................................................................................................................... 10

In re Lululemon Sec. Litig., 14 F.Supp.3d 553 2014 WL 1569500 at *9 (S.D.N.Y. 2014)........... 4

In re Marsh & McLennan Companies, Inc. Sec. Litig., 501 F.Supp.2d 452 (S.D.N.Y. 2006)..... 20

In re N. Telecom Ltd. Sec. Litig., 116 F.Supp.2d 446 (S.D.N.Y. 2000) ...................................... 23

In re Parmalat Sec. Litig., 375 F.Supp.2d 278 (S.D.N.Y. 2005). ................................................ 5,6

In re Scholastic Corp. Sec. Litig., 252 F.3d 63 (2d Cir. 2001) ..................................................... 22

In re ShengdaTech Inc. Sec. Litig., No. 11 Civ. 1918 (LGS), 2014 WL 3928606 at *7............. 22

In re Take-Two Interactive Sec. Litig., 551 F.Supp.2d 247 (S.D.N.Y. 2008)......................... 20,21

In re Vivendi Universal, S.A. Sec. Litig., 765 F.Supp.2d 512 (S.D.N.Y. 2011). .......................... 5

Kalnit v. Eichler, 264 F.3d 131 (2d Cir. 2001) ............................................................................ 22

Koch v. Christie's Int'l PLC, 699 F.3d 141 (2d Cir. 2012) ............................................................. 3

Lentell v. Merrill Lynch & Co, Inc., 396 F.3d 161 (2d Cir. 2005)........................................... 5,6,7

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004)..................................................................... 16,18

Salvani v. ADVFN PLC, 50 F.Supp.3d 459 (S.D.N.Y. 2014) .............................................. passim

Slayton v. Am. Express Co., 604 F.3d 758 (2d Cir. 2010).................................................... 13,14,16

Solow v. Citigroup, Inc., 827 F.Supp.2d 280 (S.D.N.Y. 2011)...................................................... 5

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190 (2d Cir. 2008) ................................................................................................................................ 22

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007) ....................................... 19,21

Twombly, 550 U.S. 544 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ........................................................ 3

Wiedis v. Dreambuilder Investments, LLC, 268 F.Supp.3d 457 (S.D.N.Y. 2017) ...................... 18

Wilbush v. Ambac Financial Group, Inc., 271 F.Supp.3d 473 (S.D.N.Y. 2017) .................... 13,22

Zhong Zheng v. Pingtan Marine Enterprise Ltd., 2019 WL 1508981 at *7 (E.D.N.Y. 2019), *appeal filed by* Zheng v. Pingtan Marine Enterprise Ltd., ____ F.Supp.3d (2d Cir. 2019).. 11, 23

**STATUTORY PROVISIONS**

15 U.S.C. § 78u-4(b)(2)(A) .................................................................................. 21

15 U.S.C. § 78u-4(b)(4) .................................................................................. 8,10

15 U.S.C. §78u-4(b)(2) .................................................................................. 19

15 U.S.C. §78u-5(c)(1) .................................................................................. 13, 16

Defendants Yangtze River Port and Logistics Limited ("YRIV"), Xiangyao Liu ("Liu"), Xin Zheng ("Zheng") and Tsz-Kit Chan ("Chan")[1] ("Individual Defendants" and, with YRIV, the "Defendants"), by and through their attorneys, respectfully submit this memorandum of law in support of their Motion to Dismiss the Amended Class Action Complaint (the "Amended Complaint").

## PRELIMINARY STATEMENT

Plaintiff alleges claims of securities fraud, based on Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 as well as a derivative 'control person liability' claim under Section 20(a), vaguely claiming that losses were incurred and referencing YRIV's SEC 10-Q and 10-K filings during the indicated Class Period (but never tying the losses directly to the alleged misstatements in the filings, and failing to note that the filings themselves fall within the PSLRA's 'safe harbor' provision). These holes and vague, gray areas prevent the Plaintiff from meeting the heightened pleading requirements necessary to set forth a viable cause of action. Moreover, the biggest failure on the Plaintiff's part is that the Amended Complaint relies almost entirely on something known as The Hindenburg Report. In fact, the Amended Complaint annexes The Hindenburg Report as its first and only Exhibit. See Amended Complaint, ¶¶ 7, 8, 9, 10, 11, 13, 15, 151, 153, 154, 156, 157 and at Exhibit A. See also Amended Complaint, ¶¶53-149 ("Materially False and Misleading Statements Issued During the Class Period" which are allegedly all proven by the existence of The Hindenburg Report).

---

[1] It is unclear whether Plaintiff has included James Coleman and Harvey Leibowitz as individual defendants in this matter. The caption of the Amended Class Action Complaint does not name them at all. The section of the Amended Class Action Complaint entitled 'Parties' mentions them. See Amended Class Action Complaint, ¶¶ 30 and 31. Since it remains unclear whether Messrs. Coleman and Leibowitz are included individually here or not, they do not waive and expressly reserve all rights and remedies available to them. Accordingly, to the extent this Court deems it necessary and applicable, this Motion to Dismiss is also made on their behalf with all legal arguments and remedies set forth herein also set forth on their behalf.

Significantly, there are two key pieces to The Hindenburg Report that are not mentioned in the Amended Complaint:

•Its authors specifically and self-admittedly had motive for its release to cause a decline in YRIV per-share value (see Amended Complaint, Exh. A, p. 18 of 22); and

•YRIV and its shareholders are currently involved in litigation against the authors of The Hindenburg Report for publishing false and malicious misrepresentations about YRIV, including claims of *prima facie* tort, civil conspiracy, unjust enrichment, deceptive trade practices and common law fraud (see Majestic Symbol Ltd., *et al.* v. Hindenburg Research, *et al.,* Supreme Court of the State of New York, County of New York, Index No. 150879/2019). A true and correct copy of the Summons and Verified Complaint in that action is annexed as Exhibit "A" to the accompanying Affirmation of Faun M. Phillipson, which is incorporated by reference herein.

These points, as explained in further detail below, defeat the Plaintiff's allegations at the outset and as a matter of law. First, the Plaintiff actually ties the decrease in share value to the release of The Hindenburg Report itself (which stands to reason, given that its authors stood to profit from that very same decrease in share value). See Amended Complaint, ¶ 157. The authors of The Hindenburg Report were admittedly shorting YRIV stock with a motive and intent to drive down share value. Plaintiff rests his allegations on The Hindenburg Report -- but in doing so, actually shows that The Hindenburg Report (not any alleged misrepresentations of the Defendants) was the direct and proximate cause of any losses sustained by the purported Class. Therefore, the Plaintiff has not plead and cannot demonstrate the necessary element of loss causation. The second problem with relying on The Hindenburg Report is that, in using it to demonstrate the Defendants' alleged misrepresentations, the Plaintiff rests alleged misrepresentations on alleged misrepresentations. In other words, there is a logical fallacy inherent in Plaintiff's claims of misrepresentation: Plaintiff alleges that Defendants' misrepresentations are proven false by a report that itself is replete with alleged misrepresentations (the authors of which report expressly stood to profit from driving down

stock value). Without properly plead elements of misrepresentation or loss causation (and the other pleading failures and deficiencies as a matter of law discussed below), Plaintiff has not "nudged his claims across the line from conceivable to plausible." Salvani v. ADVFN PLC, 50 F.Supp.3d 459, 470 (S.D.N.Y. 2014), citing Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Defendants respectfully request that the Amended Complaint be dismissed in its entirety with prejudice.

**LEGAL STANDARD**

**A.      Rule 12(b)(6) Motions to Dismiss.**

When ruling on a Motion to Dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the Complaint as true, and draw all reasonable inferences in the Plaintiff's favor. Koch v. Christie's Int'l PLC, 699 F.3d 141, 145 (2d Cir. 2012).

However, the Court is not required to give credit to "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." Salvani v. ADVFN PLC, 50 F.Supp.3d 459, 470 (S.D.N.Y. 2014), citing Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

To survive a Motion to Dismiss, "a complaint must contain sufficient factual matter … to 'state a claim to relief that is plausible on its face,'" containing "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Salvani at 470 (internal citations omitted). More specifically:

> [t]he plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." …. If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed.

Salvani at 470, citing Twombly, 550 U.S. at 556 and 570, 127 S.Ct. 1955.

3

**B.    Elements To Be Plead Under Section 10(b) and Rule 10b-5.**

To state a private right of action under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, a Plaintiff must plead each of the following:

> (1) the defendant made a material misrepresentation or omission, (2) with scienter, *i.e.* a wrongful state of mind, (3) in connection with the purchase or sale of a security, and (4) that the plaintiff relied on the misrepresentation or omission, thereby (5) causing economic loss.

Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).

**C.    Heightened Pleading Standard.**

Rule 9(b) requires that a securities fraud claim based on misstatements must identify "(1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent." Salvani at 470. The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires the complaint to "specify each misleading statement, set forth the reasons or factual basis for the plaintiff's belief that the statement is misleading, and state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Salvani at 471, citing Dura Pharms., Inc. at 345. Ultimately, the heightened pleading standard requires that a plaintiff's allegations "support a plausible inference that it is more likely than not that a securities law violation has been committed." Salvani at 471, citing In re Lululemon Sec. Litig., 14 F.Supp.3d 553, 570, 2014 WL 1569500 at *9 (S.D.N.Y. 2014).

**ARGUMENT**

**A.  Plaintiff Has Not -- and Cannot -- Plead Loss Causation.**

In order to pass muster, Plaintiff must properly allege that he relied on material misrepresentations (or omissions) made with the requisite scienter by the Defendants when he bought (or sold) YRIV shares, and that the perfect storm of those elements mixed together caused Plaintiff's losses. See Dura, 544 U.S. at 341-42, 125 S.Ct. 1627, 161 L.Ed.2d 577.

4

"Loss causation is the requirement that a plaintiff allege that the 'defendant's misrepresentation (or other fraudulent conduct) <u>proximately caused</u> the plaintiff's economic loss." (Emphasis supplied.) <u>Salvani</u> at 473, <u>citing</u> <u>In re Parmalat Sec. Litig.</u>, 375 F.Supp.2d 278, 305 (S.D.N.Y. 2005).

> The Second Circuit has "repeatedly analogized" the concept of loss causation to proximate cause, as loss causation requires that the damages suffered by a plaintiff be a foreseeable consequence of any misrepresentation or material omission. … In other words, to establish loss causation, there must be an allegation that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.

<u>Salvani</u> at 473-474, <u>citing</u> <u>In re Flag Telecom Holdings, Ltd. Sec. Litig.</u>, 574 F.3d 29, 36 (2d Cir. 2009) and <u>Lentell v. Merrill Lynch & Co, Inc.</u>, 396 F.3d 161, 173, (2d Cir. 2005), <u>cert.</u> <u>den.</u> 546 U.S. 935, 126 S.Ct. 421, 163 L.Ed.2d 321 (2005).

There are two ways to demonstrate the element of loss causation: the 'corrective disclosure theory' and the 'materialization of risk method.' <u>See</u> <u>Salvani</u> at 474, <u>citing</u> <u>Solow v. Citigroup, Inc.</u>, 827 F.Supp.2d 280, 292 (S.D.N.Y. 2011). Under the 'corrective disclosure theory,' the Plaintiff could show that losses resulted from the reaction of the market to a corrective disclosure revealing a prior misleading statement. <u>See</u> <u>id.</u> Under the 'materialization of risk method,' the new information that is revealed must have been "previously concealed and fall within the 'zone of risk' concealed so that the events were foreseeable consequences of the fraud." <u>Salvani</u> at 475, <u>citing</u> <u>In re Vivendi Universal, S.A. Sec. Litig.</u>, 765 F.Supp.2d 512, 555 (S.D.N.Y. 2011).

It is unclear -- because the Plaintiff's Amended Complaint is so vague and generalized -- which loss causation method the Plaintiff relies on here. It appears most likely Plaintiff relies on the 'materialization of risk' method, since (a) Plaintiff does not allege that any 'corrective disclosures' were made, and (b) Plaintiff relies heavily, if not entirely, on "The Hindenburg

Report" and its 'revelations' of information allegedly contrary to that contained in YRIV's 10Q's and 10K's.[2]  See Amended Complaint ("The Truth Emerges"), ¶¶ 151-157.  The Plaintiff's allegation of loss causation rests in this statement: "As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial."  See Amended Complaint, ¶176.  As discussed below, this is not enough.

### i. Plaintiff's Vague Allusion to Loss Causation is Not Enough.

The 'materialization of risk theory' for alleging the element of loss causation "requires a direct connection between the risk that is hidden from investors and the subsequent loss suffered by those investors."  Salvani at 475. (Emphasis added.)  In Salvani, Judge Ramos used the Parmalat case as an example in which the plaintiffs properly plead loss causation under the materialization of risk theory by alleging the company's auditors had misrepresented the completeness and accuracy of the financial statements (when, in fact, the auditors had done just that: understated debt, overstated revenues and assets), the truth of which came to light when the company suffered a liquidity crisis and was unable to pay bonds that came due.  See Salvani at 475; see also In re Parmalat Sec. Litig., 375 F.Supp.2d 278, 306 (S.D.N.Y. 2005).  Judge Ramos contrasted the direct causation link in Parmalat with the failure to properly plead loss causation in Lentell.  In Lentell, the Court affirmed dismissal of a 10(b)(5) claim for failure to plead loss causation because there was "no allegation that Merrill misstated or omitted the risks that did lead to the loss.  This is fatal under the Second Circuit."  Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 175  (2d Cir. 2005), cert. den. 546 U.S. 935, 126 S.Ct. 421, 163 L.Ed.2d 321 (2005).

---

[2] Here, Plaintiff cites a number of alleged 'misrepresentations,' stemming from SEC 10Q and 10K filings (and one Press Release dated April 17, 2017).  See Amended Complaint, ¶¶53-149.  The Plaintiff takes approximately 100 paragraphs in which to repeat and reallege the same 'misrepresentations.' The Plaintiff alleges that had he (and the other class members) been aware "that the market price of Yangtze securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Yangtze securities at the artificially inflated prices that they did, or at all."  See Amended Complaint, ¶175.

In the case at issue, Plaintiff alleges misstatements, and Plaintiff alleges an inflated share price. See generally, Amended Complaint at ¶175. The Plaintiff also alleges that the share price declined in value. See Amended Complaint at ¶157. The Plaintiff [vaguely] alleges a loss. See Amended Complaint at ¶¶158 and 176. The Plaintiff does not allege that YRIV stock declined in value because of the Defendants' alleged misrepresentations. See Amended Complaint at ¶158 ("Defendants' wrongful acts and omissions" and "the precipitous decline in the market value of the Company's common shares" are set forth as two separate, independent and disjunctive clauses.) This failure to allege that the purported misrepresentations directly lead to Plaintiff's loss "is fatal under Second Circuit precedent." Lentell at 175.

For ease of reference, this is what the Amended Complaint alleges (and it specifically ties the decline in share value to The Hindenburg Report itself):

> 156. The Hindenburg Report also reported that proceeds from capital raises, including notes the Company issued privately in 2018, have gone directly to Defendant Liu.
>
> 157. On this news, shares of Yangtze fell from an $11.62 per share closing price on December 4, 2018, the last trading day before the release of the Hindeburg Report, to an $8.28 closing price on December 7, 2018, falling nearly 29% in two trading days.
>
> 158. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiffs and other Class members have suffered significant losses and damages.

Amended Complaint, p. 53. The Amended Complaint cites The Hindenburg Report as the reason for the decline in share value, and separately (and very broadly and vaguely) refers to 'misrepresentations' made by the Defendants. The Plaintiff does not, because he cannot, tie the two together.

Ultimately, "the burden of loss causation rests on the plaintiff and requires that the plaintiff show that the misstatements were the reason the transaction turned out to be a losing one." <u>Salvani</u> at 473, <u>citing</u> 15 U.S.C. § 78u-4(b)(4); <u>First Nationwide Bank v. Gelt Funding Corp.</u>, 27 F.3d 763 769 (2d Cir. 1994), <u>cert.</u> <u>den.</u> 513 U.S. 1079, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995). The Plaintiff does not allege that any purported misstatements by the Defendants caused the stock price to decline therefore resulting in the vague and undefined losses supposedly incurred. Rather, the Plaintiff contends that The Hindenburg Report itself caused the share value to "fall nearly 29% in two trading days." <u>See</u> <u>Amended Complaint</u>, ¶¶ 12 and 157. Even in the Amended Complaint's 'bullet point' list of issues common to the supposed class, the Plaintiff fails to draw a connection between the so-called bad acts of the Defendants and the so-called losses of the Plaintiff.

> Among the questions of law and fact common to the Class are:
> …
> •whether the prices of Yangtze securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
> •whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

<u>Amended Complaint</u>, p. 54-55. Plaintiff makes no attempt to allege or even ask whether the purportedly inflated per-share value <u>caused</u> the damages; Plaintiff simply asks whether the alleged misrepresentations caused an increased share price and whether (maybe related, maybe not -- it is unclear from the pleading) damages were sustained. <u>Id.</u> This omits the element of loss causation altogether. The Plaintiff's failure to allege a causal connection -- much less a direct causal connection -- between the Defendants' supposed misstatements and the decline in share value is "fatal" to the claim.

### ii. Plaintiffs' Alleged Grounds for Loss Causation are Inherently Flawed.

The Plaintiff repeatedly refers to The Hindenburg Report as a "revelation" unveiling the alleged misrepresentations supposedly made by the Defendants.[3] See Amended Complaint ("The Truth Emerges"), ¶¶ 151-157. The Plaintiff also annexes The Hindenburg Report as Exhibit A to the Amended Complaint.

In touting The Hindenburg Report as the gospel of truth, the Plaintiff fails to mention that The Hindenburg Report specifically states the following:

**Disclosure:** We are short YRIV.

See Amended Complaint, Exh. A., p. 18 of 22. (Emphasis in original.) Below that it says Hindenburg Research "**has a short position in all stocks covered herein, and therefore stands to realize significant gains in the event that the price of any stock covered herein declines**."[4] Id. (Emphasis supplied.) This is the opposite of a so-called "pump and dump," and instead, is known as a "short and distort" scheme. This is The Hindenburg Report specifically admitting that Hindenburg Research's best interests are served by causing a serious decline in per-share value so that Hindenburg Research, which has already 'sold high' because it "has a short position in all stocks covered herein," can now 'buy low' and profit from its scheme. Not at all coincidentally, there was a dramatic spike in the "short interest" in the stock almost immediately after the Hindenburg Report was published on December 6, 2018. That is precisely what the Hindenburg Report said would happen: "Following publication of any report or letter, we intend to continue transacting in the securities covered herein…." Id.

---

[3] The Amended Complaint also makes a broad reference to "Chinese court records" which conveniently "are not available in English" as grounds for their allegations of misrepresentations, but at no point does the Amended Complaint draw a direct causal link between the alleged misrepresentations and any purported loss incurred.

[4] "Short selling" is an investment or trading strategy that speculates on the decline in a stock or other securities price. www.Investopedia.com.

As set forth above, "the burden of loss causation rests on the plaintiff and requires that the plaintiff show that the misstatements were the reason the transaction turned out to be a losing one." Salvani at 473, citing 15 U.S.C. § 78u-4(b)(4); First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763 769 (2d Cir. 1994), cert. den. 513 U.S. 1079, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995). The Plaintiffs do not -- and cannot -- plead or demonstrate a proximate or direct causal connection between Defendants' alleged misrepresentations and the decline in YRIV share value because, as the Amended Complaint expressly states, it was The Hindenburg Report itself that caused the share price to fall.

> 157. On this news, shares of Yangtze fell from an $11.62 per share closing price on December 4, 2018, the last trading day before the release of the Hindenburg Report, to an $8.28 closing price on December 7, 2018, falling nearly 29% in two trading days.

Amended Complaint, ¶157. See also ¶12. This does not adequately allege loss causation, because:

> Loss causation – "a concept analogous to the common law concept of 'proximate cause'" – demands that plaintiffs "show that [their] loss was caused by the fraud and not by other intervening events.

In re Global Brokerage, Inc., 2019 WL 1428395 at *17, Fed. Sec. L. Rep. P. 100, 390 (S.D.N.Y. 3/28/2019), citing In re Fannie Mae 2008 Sec. Litig., 742 F. Supp. 2d 382, 397 (S.D.N.Y. 2010).

Even assuming, arguendo and as we must here for the purposes of a Motion to Dismiss, that Plaintiff's allegations are true -- that is, even assuming for a moment that Defendants made misrepresentations akin to wielding an axe directly aimed at the YRIV shareholders -- even if that were the case, Plaintiff's allegations still fail because The Hindenburg Report itself was an explosive disaster worthy of its namesake. It decimated the per-share value self-admittedly due to the report's authors shorting the stock. The Plaintiff has not properly plead loss causation because he points to no direct and immediate connection between "the risk that is hidden from investors" and the "subsequent loss suffered by those investors." Salvani at 475. The "short and distort"

scheme worked to perfection. The stock price is down approximately 80% since the Hindenburg Report, while "short interest" trading and the number of shares trading exploded. This is "the reason the transaction turned out to be a losing one." Salvani at 473.

### iii. *The Pingtan Marine Case*

In Zhong Zheng v. Pingtan Marine Enterprise Ltd., this Court granted a 12(b)(6) motion to dismiss where the Plaintiff in a proposed securities class action alleged Defendant Pingtan Marine Enterprise Ltd. ("Pingtan") made materially false or misleading statements or omissions identified in five public filings. 2019 WL 1508981 at *2 (E.D.N.Y. 2019), *appeal filed by* Zheng v. Pingtan Marine Enterprise Ltd., ___ F.Supp.3d ___ (2d Cir. 2019). There, the proposed class action was based on the "Aurelius Article," which Plaintiff alleged was a corrective disclosure and caused a 28% drop in Pingtan's stock price. Id. at *1 and *8. The Court found that:

> the Aurelius Article did not reveal any undisclosed information. Rather, the Aurelius Article relied on public information and merely represented the author's opinion that Pingtan's "shares are likely worthless" and that "shareholders are likely to be left with total losses." (Aurelius Art. At 3). See Janbay, 2012 WL 1080306 at *16 (S.D.N.Y. Mar. 30 2012) (" "[R]aising … questions and speculation by analysts and commentators does not reveal any 'truth' about an alleged fraud" for purposes of loss causation.")

Id. at * 9. Here, although Plaintiff in this case doesn't cite to The Hindenburg Report as a "corrective disclosure" the same reasoning as to speculation and questions raised by analysts and commentators should hold true (especially where, as here, the authors of The Hindenburg Report are short YRIV positions).

### B. The Amended Complaint Fails to Allege Actionable Misstatements or Omissions.

The Amended Complaint contains nearly forty (40) pages of allegedly "false and misleading statements" by repeatedly referencing YRIV's 10-K and 10-Q SEC filings (and a single Press Release dated April 17, 2017) during the time-frame Plaintiff has defined as the Class Period.

#### *i. Allegations Regarding Financial Statements Are Not Plead Properly.*

The SEC defines the 10-Q as follows:

> The federal securities laws require publicly traded companies to disclose information on an ongoing basis. For example, domestic issuers must submit annual reports on Form 10-K, quarterly reports on Form 10-Q, and current reports on Form 8-K for a number of specified events and must comply with a variety of other disclosure requirements.
>
> The Form 10-Q includes unaudited financial statements and provides a continuing view of the company's financial position during the year. The report must be filed for each of the first three fiscal quarters of the company's fiscal year.

https://www.sec.gov/fast-answers/answersform10qhtm.html. (Emphasis supplied.) The SEC defines the 10-K as follows: "The annual report on Form 10-K provides a comprehensive overview of the company's business and financial condition and includes audited financial statements." https://www.sec.gov/fast-answers/answers-form10khtm.html. (Emphasis supplied.) The 10-K and 10-Q are, according to the SEC, a statement of financial condition including audited (10-K) and unaudited (10-Q) financial statements. See id.

In Paragraphs 53 through 149 of the Amended Complaint, the Plaintiff references YRIV's 10-K's and 10-Q's and alleges, among other things, they were "materially false and misleading because Defendants knew or recklessly disregarded that it falsely reported the Company's assets." See Amended Complaint, ¶54 (2015 10-K), ¶60 (1Q 2016 10-Q), ¶67 (2Q 2016 10-Q), ¶74 (3Q 2016 10-Q), ¶81 (2016 10-K), ¶89 (1Q 2017 10-Q), ¶97 (2Q 2017 10-Q), ¶106 (3Q 2017 10-Q), ¶115 (2017 10-K), ¶124 (1Q 2018 10-Q), ¶133 (2Q 2018 10-Q), ¶142 (3Q 2018 10-Q). According to the Amended Complaint, YRIV's "reported assets" were "false and misleading." Id.

However, a bare allegation of supposedly misleading financial statements alone is not enough to satisfy the pleading standard requirements because Plaintiff makes no allegations that

YRIV's statements are inconsistent with an applicable accounting standard or the industry standard.

> Where, as here, a plaintiff claims that a company's financial statements are misleading but fails to allege that the company violated a single Generally Accepted Accounting Principle ("GAAP") or industry standard, the plaintiff "falls short of plausibly alleging a misstatement or omission."

Wilbush v. Ambac Financial Group, Inc., 271 F.Supp.3d 473, 488 (S.D.N.Y. 2017), citing Harris v. AmTrust Fin. Servs., Inc., 135 F.Supp.3d 155, 160 (S.D.N.Y. 2015), aff'd, 649 Fed.Appx. 7 (2d Cir. 2016) and Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC, 376 F.Supp.2d 443, 447 (S.D.N.Y. 2005) (where plaintiffs alleged that defendants had misrepresented the value of certain assets but did "not allege that the differences in valuations were outside the range of what was considered normal in the industry.")  Because Plaintiff has failed to properly plead allegations concerning the financial statements, the Plaintiff's allegations of misrepresentation with regard to the 10-Q and 10-K financial statements should be dismissed.

## ii.  *Management Expectations Were Forward-Looking and Accompanied by Cautionary Language.*

The PSLRA "safe harbor" provision for forward-looking statements provides that "a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language … or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading."  Slayton v. Am. Express Co., 604 F.3d 758, 766 (2d Cir. 2010).  See also 15 U.S.C. §78u-5(c)(1).

Plaintiff bases all (except one reference to the April 2017 Press Release, addressed in Section C, *below*) of his claims on alleged misstatements contained in YRIV's 10-Q and 10-K filings.  The purported misrepresentations of financial condition are discussed above, and the other

alleged misrepresentations addressed here are paradigmatic forward-looking statements accompanied by cautionary language. See Slayton, 604 F.3d at 769 (statements with "linguistic cues like 'we expect'" are forward looking statements).

The Amended Complaint refers to twelve SEC filings, and each time the Amended Complaint cites to excerpts from the filings, those excerpts in the Amended Complaint itself also recite YRIV's forward-looking statements. See Amended Complaint, pp. 12-51. Since the Amended Complaint does not annex the filings it references, the accompanying Affirmation of Faun M. Phillipson (incorporated by reference herein) annexes as Exhibits B-R true and correct copies of the SEC filings and single Press Release referred to in the Amended Complaint.

The following chart reflects (i) the filing referenced in the Amended Complaint, (ii) where it is located in the Amended Complaint, and then (iii) the forward-looking language in that filing (and also contained in the excerpts founds in the Amended Complaint):

| FILING AT ISSUE | LOCATION | FORWARD-LOOKING LANGUAGE |
|---|---|---|
| **2015 10-K[5]** | **¶¶53-58** | "is expected" |
| 1Q 2016 10-Q | ¶¶59-65 | "is believed"<br>"is also expected"<br>"is expected" |
| **2Q 2016 10-Q** | **¶¶66-72** | "is believed"<br>"is also expected"<br>"is expected" |
| 3Q 2016 10-Q | ¶¶73-79 | "is believed"<br>"is also expected"<br>"is expected" |
| **2016 10-K** | **¶¶80-86** | "is expected"<br>"are expected" |
| 1Q 2017 10-Q | ¶¶89-95 | "is believed"<br>"is expected"<br>"is also expected" |

---

[5] YRIV filed an Amended 10-K for the year ended December 31, 2015, which is not mentioned in the Amended Complaint.
https://www.sec.gov/Archives/edgar/data/1487843/000121390016013493/f10k2015a3_yangtzeriver.htm#a_001

| 2Q 2017 10-Q | ¶¶ 96-104 | "is believed" "is expected" "is also expected" |
|---|---|---|
| 3Q 2017 10-Q | ¶¶105-113 | "is believed" "is expected" "is also expected" |
| **2017 10-K** | **¶¶114-122** | "is believed" "is also expected" "We anticipate" "is expected" |
| 1Q 2018 10-Q | ¶¶123-131 | "is believed" "is also expected" "is expected" |
| **2Q 2018 10-Q** | **¶¶132-140** | "is believed" "is also expected" "is expected" |
| 3Q 2018 10-Q | ¶¶141-149 | "is believed" "is also expected" "is expected" |

This chart (or a review of the Amended Complaint at pages 12-51) demonstrates Defendants' use of forward-looking language in the relevant SEC filings requisite to the PSLRA's "safe harbor" provision. The filings also contain language specifically referencing their forward-looking statements. For instance, the 2015 10-K filed with the SEC specifically states:

**FORWARD-LOOKING STATEMENTS**

This Annual Report on Form 10-K (this "Report") contains "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Forward-looking statements discuss matters that are not historical facts. Because they discuss future events or conditions, forward-looking statements may include words such as "anticipate," "believe," "estimate," "intend," "could," "should," "would," "may," "seek," "plan," "might," "will," "expect," "predict," "project," "forecast," "potential," "continue" negatives thereof or similar expressions. These forward-looking statements are found at various places throughout this Report and include information concerning

possible or assumed future results of our operations; business strategies; future cash flows; financing plans; plans and objectives of management; any other statements regarding future operations, future cash needs, business plans and future financial results, and any other statements that are not historical facts.

From time to time, forward-looking statements also are included in our other periodic reports on Forms 10-Q and 8-K, in our press releases, in our presentations, on our website and in other materials released to the public. Any or all of the forward-looking statements included in this Report and in any other reports or public statements made by us are not guarantees of future performance and may turn out to be inaccurate. These forward-looking statements represent our intentions, plans, expectations, assumptions and beliefs about future events and are subject to risks, uncertainties and other factors. Many of those factors are outside of our control and could cause actual results to differ materially from the results expressed or implied by those forward-looking statements. In light of these risks, uncertainties and assumptions, the events described in the forward-looking statements might not occur or might occur to a different extent or at a different time than we have described. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date of this Report. All subsequent written and oral forward-looking statements concerning other matters addressed in this Report and attributable to us or any person acting on our behalf are expressly qualified in their entirety by the cautionary statements contained or referred to in this Report.

Except to the extent required by law, we undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events, a change in events, conditions, circumstances or assumptions underlying such statements, or otherwise.

https://www.sec.gov/Archives/edgar/data/1487843/000121390016010526/f10k2015_yangtzeriver.htm#a_008.

The "safe harbor" requirement of meaningful cautionary language as an accompaniment to the forward-looking statements has been met. See Slayton v. Am Express Co., 604 F.3d at 766; see also 15 U.S.C. §78u-5(c)(1). Here, even though "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future," Rombach v. Chang, 355 F.3d

164, 174 (2d Cir. 2004), the SEC filings at issue included plentiful and meaningful cautionary language.

For example, the 2015 10-K specifically includes the "FORWARD LOOKING LANGUAGE" warning cited above.  It also states the company generated no revenue ("During the fiscal year ended December 31, 2015, we did not generate any revenue") and stated "operating loss was $4,559,223 for the fiscal year ended December 31, 2015." https://www.sec.gov/Archives/edgar/data/1487843/000121390016010526/f10k2015_yangtzeriver.htm.

As another example, the 1Q 2016 10-Q referenced in the Amended Complaint cites "**Factors Affecting our Operating Results**" and warns that "We operate and derive all of our revenue from operations in China…. if the Chinese economy were to become significantly affected by a negative stimulus, China's growth rate would likely fall and our revenue could correspondingly decline."  The filing also warns that *"Government Regulations"* are a factor, with regard to "Land Use Rights," "Land Development" and "Project Financings."  The filing goes on to reference "*Interest Rate and Inflation Challenges*" stating "[w]e are subject to market risks due to fluctuations in interest rates and refinancing of mid-term debt…." And with regard to "Revenue" the filing states:

> *Revenue.*
>
> We did not generate any revenue from the sales of real estate property for the three months ended March 31, 2016 and 2015. In addition, since our Logistics Center is still in its development stage and therefore is not yet in operation, we have not started providing any logistics service within our port terminal and have not generated any sales from providing such services.

https://www.sec.gov/Archives/edgar/data/1487843/000121390016013082/f10q0316_yangtzeriver.htm (page 21).

The SEC filings referenced in the Amended Complaint, which serve as the basis for the alleged misrepresentations at issue, contain forward-looking statements <u>and</u> cautionary language, thereby falling within the PSLRA's "safe harbor."

**C. <u>All Allegations Regarding the April 17, 2017 Press Release Should be Dismissed.</u>**

As set forth above, the heightened pleading requirements of both Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA require the Amended Complaint to include the following with regard to the alleged misrepresentations of material fact:

> (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.

<u>Wiedis v. Dreambuilder Investments, LLC</u>, 268 F.Supp.3d 457, 464 (S.D.N.Y. 2017) <u>citing</u> <u>Rombach v. Chang</u>, 355 F.3d 164, 170 (2d Cir. 2004).

Here, in Paragraphs 87-88 of the Amended Complaint, the Plaintiff refers to an April 2017 Press Release, quotes directly from that Press Release, then simply (and solely) states it is "materially false and misleading" because "Plaintiffs' field investigation confirmed that Wuhan Newport was not developing the Port Logistics Center." <u>Amended Complaint</u> at ¶88. It is relevant to note that the excerpt of the Press Release copied in the Amended Complaint at ¶87 <u>never</u> mentions the "Port Logistics Center" and <u>does</u> contain paradigmatic forward-looking statements such as "is expected" and "is also expected." More importantly, though, it is unclear whether the Plaintiff takes issue with the entirety of the Press Release, or a specific sentence in the Press Release, or which specific sentence, and who it is that the Plaintiff claims authored the Press Release. There is also a section in the Press Release -- which is larger in length than the substantive text of the Press Release itself -- entitled "**FORWARD-LOOKING STATEMENTS**" with a paragraph of cautionary language following.

Paragraphs 87-88 of the Amended Complaint, and any allegations concerning the April 2017 Press Release, should be dismissed as improperly plead because (i) the Plaintiff has not met the heightened pleading requirements here, and (ii) the PSLRA's "safe harbor" applies in light of the forward-looking statements accompanied by meaningful cautionary language.

### D. Plaintiff Has Not Properly Plead the Element of Scienter.

The Amended Complaint fails to "state with particularity facts giving rise to a strong inference that [any of the Defendants in this case] acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). The required state of mind is "an intent to deceive, manipulate, or defraud." Ganino v. Citizens Utils. Co., 228 F.3d 154, 168 (2d Cir. 2000). Further, "the inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007). In making this determination, the Court "must consider plausible, nonculpable explanations for the defendant's conduct." Id.

There are two ways of establishing an inference of scienter here, either by alleging facts:

> (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness. ATSI Commc'ns, 493 F.3d at 99. To alleged "motive and opportunity" to defraud, a complaint must allege facts showing that the defendants "benefitted in some concrete and personal way from the purported fraud." Novak, 216 F.3d at 307-08.

> "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." Kalnit v. Eichler, 265 F.3d 131, 142 (2d Cir. 2001) (internal quotation marks omitted).

Desyatnikov v. Credit Suisse Group, Inc., 2012 WL 1019990 at *6 (E.D.N.Y. 2012), Fed. Sec. L. Rep. P 96, 777.

### i. No Particularity with Regard to the Individual Defendants.

Critically, Plaintiff must allege with particularity that <u>each individual defendant</u> acted with the requisite scienter. <u>In re AstraZeneca Sec. Litig.</u>, 559 F.Supp.2d 453, 472 (S.D.N.Y. 2008); <u>In re BISYS Sec. Litig.</u>, 397 F.Supp.2d 430, 440-41 (S.D.N.Y. 2005). The group pleading doctrine cannot be used to create a presumption of scienter as to individual defendants. <u>Id.</u> "[T]he lumping of allegations against "defendants" does not meet the particularity requirements for pleading scienter." <u>Desyatnikov v. Credit Suisse Group, Inc.</u>, 2012 WL 1019990 at *7. Here, however, Plaintiff has done just that:  the allegations regarding the 10-K filings allege they were signed by Liu, Zheng, Coleman and Liebowitz, and the 10-Q allegations refer to Liu's and Zheng's signed SOX certifications.  (The Press Release allegations name no one in particular.)

This is not enough to keep the Individual Defendants[6] in this case as a matter of law. Crucially, "the presence of [the Individual Defendants'] signature on relevant SEC filings that allegedly contained misstatements does not give rise to a strong inference of scienter."  <u>See In re Take-Two Interactive Sec. Litig.</u>, 551 F.Supp.2d 247, 304 (S.D.N.Y. 2008); <u>see also</u>, <u>In re Marsh & McLennan Companies, Inc. Sec. Litig.</u>, 501 F.Supp.2d 452, 485 (S.D.N.Y. 2006) ("The mere existence of allegedly misleading language in [an SEC filing] does not compel a conclusion that all of the signatories were aware that it was misleading.")

The Court, in <u>In re Take-Two Interactive</u>, also held:

> The Court reaches the same conclusion with respect to Winters's Sarbanes–Oxley certifications that he had designed adequate disclosure and control mechanisms. For the reasons set forth persuasively in *Garfield v. NDC Health Corporation*, a Sarbanes–Oxley certification is probative of scienter only if the complaint alleges specific contrary information, such as "glaring accounting irregularities or other 'red flags,' " of which the certifying defendant had "reason to know." 466 F.3d 1255, 1266 (11th Cir. 2006)

---

[6] Including Leibowitz and Coleman, who – if they are individual defendants – should be dismissed as a matter of law.

In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 304–05 (S.D.N.Y. 2008). Here, again, the SOX allegations made by Plaintiff's counsel against Defendants Liu and Chan use the key words "materially false and misleading because it falsely reported the Company's assets" and "knew or recklessly disregarded, however, that the Company did not have real estate properties and land lots under development…" but conveniently leaves out that this (a) is based on what an unnamed "field investigator" learned in an attempt to suss out the Hindenburg Report's veracity, which was self-admittedly biased, and (b) the filings the Plaintiff cites include forward-looking language in the very language cited in the Amended Complaint. (See, e.g., ¶135: "is believed…," "anticipated," "to be fully developed…," "will be," "is also expected…," "is expected….").  These do not give rise to a "strong inference of scienter" as required.

"Under the heightened pleading requirements of the PLSRA, plaintiffs must "state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind."  Desyatnikov v. Credit Suisse Group, Inc., 2012 WL 1019990 at *7, citing 15 U.S.C. § 78u-4(b)(2)(A).  Part of the three-step analysis set forth by the Supreme Court when evaluating scienter includes not only accepting all factual allegations as true for purposes of the motion to dismiss as well as consideration of the complaint in its entirety, but also:

> *Third*, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences…. The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared with others, follows from the underlying facts?

Desyatnikov v. Credit Suisse Group, Inc. at *7, citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322-23 (emphasis in original).  Not only has the "strong inference" not been supplied by Plaintiff's allegations but, comparing the conclusions and not working in a vacuum, considering Plaintiff's reliance on The Hindenburg Report contrasted with the lack of allegation of particular

facts giving rise to the allegedly actionable mind state, Plaintiff fails to satisfy the heightened pleading standards here, too.

### ii. No Conscious Misbehavior Has Been Alleged.

Where a plaintiff seeks to plead scienter by alleging conscious misbehavior or recklessness, the Complaint must "allege[] that defendants…had access to non-public information contradicting their public statements." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 76 (2d Cir. 2001). "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Wilbush at 485, citing Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 196 (2d Cir. 2008).

The facts alleged simply do not show that the Individual Defendants knew about or participated in the alleged fraud and come nowhere close to establishing the requisite strong inference of scienter. See e.g., In re Citigroup, Inc. Sec. Litig., 330 F.Supp.2d 367, 381 (S.D.N.Y. 2004) (plaintiff must allege that each individual defendant "personally knew, or participated in, the fraud"). As in the ShengdaTech case, the Individual Defendants here are not alleged to have personally had actual knowledge that the 10-K's or 10-Q's were false or misleading at the time of filing. In re ShengdaTech Inc. Sec. Litig., No. 11 Civ. 1918 (LGS), 2014 WL 3928606 at *7.

### iii. No Motive Has Been Alleged.

Scienter can also be plead through allegations of motive and opportunity, but "[m]otives that are generally possessed by most corporate directors and officers do not suffice." Wilbush, 271 F.Supp.3d. at 485, citing Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001). "Insufficient motives … include … the desire to keep stock prices high to increase officer compensation." Id. Here, no motive has been alleged at all. Maybe -- maybe -- the one allegation relating to motive is found in Paragraph 5 of the Amended Complaint (although it is not phrased as such), which

states "In reality, Yangtze was a scheme to enrich Xiangyao Liu ("Liu"), its controlling shareholders and Chief Executive Officer ("CEO")." First, guessing at allegations is not a leap Defendants should have to make. Second, if the scheme was to enrich the controlling shareholders it stands to reason all shareholders would be enriched, as well, since there were no allegations made of selling at "opportune" times and there are no allegations of shares sold at the expense of Plaintiff shareholders. "The absence of stock sales by insiders … is inconsistent with an intent to defraud shareholders." In re N. Telecom Ltd. Sec. Litig., 116 F.Supp.2d 446, 462 (S.D.N.Y. 2000). It is not even clear that the Amended Complaint has set forth a single benefit the Individual Defendants realized by virtue of the information contained in the SEC filings at issue.

### E. The Alleged Violations of Section 20(a) for "Control Person Liability" Against the Individual Defendants Should be Dismissed.

Plaintiff's claim under Section 20(a) of the Exchange Act should be dismissed as against all Defendants for two reasons. First, the Amended Complaint fails to allege a primary violation of the Exchange Act, as discussed above, which is a prerequisite to a Section 20(a) claim. See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007). Second, for the same reasons Plaintiff fails to plead scienter for an Individual Defendant for purposes of the Section 10(b) claim, the Amended Complaint fails to allege any of the Individual Defendant's "particular culpability." Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998).

> To state a claim under §20a of the Exchange Act, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.

Zhong Zheng v. Pingtan Marine Enterprise Ltd., 2019 WL 1508981 at *7 (E.D.N.Y. 2019); *appeal filed by* Zheng v. Pingtan Marine Enterprise Ltd., ___ F.Supp.3d ___ (2d Cir. 2019).

The Amended Complaint should also be dismissed with regard to Messrs. Coleman and Leibowitz because, in addition to all of the arguments set forth above, and even with the heightened pleading requirements that apply here, it is not clear from the Amended Complaint whether they are actually individually named defendants or just being mentioned in the recitation of allegations. Neither Coleman nor Leibowitz are included in the caption, and while they are mentioned in the group pleading format discussed above, it is only in a cursory manner. This is, by its very definition, a failure to properly plead wrongdoing.

## CONCLUSION

For the foregoing reasons, the Defendants respectfully request that Plaintiff's Amended Complaint be dismissed in its entirety with prejudice and that the Court grant any such other and further relief as the Court deems necessary and proper.

Dated: July 16, 2019
New York, New York

Respectfully submitted,

PHILLIPSON & URETSKY, LLP

Jonathan Uretsky
Faun M. Phillipson
111 Broadway, 8th Floor
New York, New York 10006
t: (212) 571-1164

*Counsel for Defendants*