## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

---

MICHAEL BEHRENDSEN, Individually and on behalf of all others similarly situated,

        Plaintiff,

        v.

YANGTZE RIVER PORT AND LOGISTICS LIMITED, XIANGYAO LIU, XIN ZHENG, TSZ-KIT CHAN, JAMES COLEMAN and HARVEY LEIBOWITZ,

        Defendants.

---

**Case No: 1-19-cv-00024-DLI-LB**

**<u>CLASS ACTION</u>**

**<u>JURY TRIAL DEMANDED</u>**

## LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ................................................................. 1

II. STATEMENT OF FACTS .................................................................... 2

 A. Yangtze Enters the U.S. Market ................................................... 2

 B. Defendants Repeatedly Lie to Investors ....................................... 3

 C. Defendants' Scheme Becomes Public ........................................... 4

III. ARGUMENT .................................................................................. 5

 A. Legal Standard .............................................................................. 5

 B. Defendants Improperly Demand that the Court Resolve Issues of Fact on the Pleadings ................................................................. 6

 C. Defendants Made Material and Actionable Misrepresentations ............................. 9

  1. The Complaint Adequately Pleads Material False Statements and Omissions Regarding Yangtze's Reported Assets ................................................... 10

  2. The PSLRA's Safe Harbor Does Not Protect Defendants' False Statements and Omissions Because They Were not Forward Looking ............................... 12

 D. The Complaint Adequately Alleges a Strong Inference of Scienter ...................... 16

 E. The Complaint Adequately Pleads Loss Causation ................................... 21

 F. Plaintiffs Adequately Pled Control Person Liability ................................ 23

IV. CONCLUSION .............................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abraham v. Town of Huntington*,
No. 217CV03616ADSSIL, 2018 WL 2304779 (E.D.N.Y. May 21, 2018) ................................ 8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................... 5

*Atlas v. Accredited Home Lenders Holding Co.*,
556 F. Supp. 2d 1142 (S.D. Cal. 2008) ........................................................... 8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................................... 5

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014) ......................................................................... 21

*China Educ. All., Inc. Sec. Litig.*, No. CV 10-9239 CAS JCX,
No. CV 10-9239 CAS JCX, 2011 WL 4978483 (C.D. Cal. Oct. 11, 2011) ...................... Passim

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012) ............................................................. 9

*Elliott Assocs., L.P. v. Hayes*,
141 F. Supp. 2d 344 (S.D.N.Y. 2000) ............................................................ 24

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
783 F.3d 395 (2d Cir. 2015) ....................................................................... 1, 6

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
376 F. Supp. 2d 443 (S.D.N.Y. 2005) ........................................................... 11

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) ........................................................... 21

*GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*,
838 F.3d 214 (2d Cir. 2016) ......................................................................... 6

*Glidepath Holding B.V. v. Spherion Corp.*,
590 F. Supp. 2d 435 (S.D.N.Y. 2007) ........................................................... 21

*Global Network Commc'ns, Inc. v. City of New York*,
 458 F.3d 150 (2d Cir. 2006) ................................................................... 7

*Harris v. AmTrust Fin. Servs., Inc.*,
 135 F. Supp. 3d 155 (S.D.N.Y. 2015) ................................................... 10

*Henry Avocado Corp. v. Z.J.D. Brother, LLC*,
 No. 17-CV-4559 (ARR), 2017 WL 6501864 (E.D.N.Y. Dec. 19, 2017) ................................... 6

*Ho v. Duoyuan Global Water, Inc.*,
 887 F.Supp.2d 547 (S.D.N.Y. 2012) ..................................................... 23

*Illinois State Bd. of Inv. v. Authentidate Holding Corp.*,
 369 F. App'x 260 (2d Cir. 2010) .......................................................... 12

*In re Adams Golf, Inc. Sec. Litig.*,
 381 F.3d 267 (3d Cir. 2004) ................................................................... 9

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
 741 F. Supp. 2d 511 (S.D.N.Y. 2010) ................................................... 15

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
 324 F. Supp. 2d 474 (S.D.N.Y. 2004) ................................................... 19

*In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*,
 763 F. Supp. 2d 423 (S.D.N.Y. 2011) ................................................... 17

*In re Bristol Myers Squibb Co. Sec. Litig.*,
 586 F. Supp. 2d 148 (S.D.N.Y. 2008) ................................................... 22

*In re Carter-Wallace, Inc., Sec. Litig.*,
 220 F.3d 36 (2d Cir. 2000) ................................................................... 17

*In re Delcath Sys., Inc. Sec. Litig.*,
 36 F. Supp. 3d 320 (S.D.N.Y. 2014) ..................................................... 19

*In re Facebook IPO Sec. and Deriv Litig.*,
 986 F.Supp.2d 487 (S.D.N.Y. 2013) ..................................................... 15

*In re Prudential Sec. Inc. Ltd. Partnerships Litig.*,
 930 F. Supp. 68 (S.D.N.Y. 1996) ......................................................... 15

*In re Scholastic Corp. Sec. Litig.*,
 252 F.3d 63 (2d Cir. 2001) ................................................................... 17

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011) ................................................................ 12, 13, 14, 16

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ................................................................................ 13

*In re Winstar Commc'ns*,
  No. 01 CV 11522, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) .............................. 23

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ................................................................................ 7

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) ................................................................................ 21

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) .......................................................................................... 5, 9

*McIntire v. China MediaExpress Holdings, Inc.*,
  927 F. Supp. 2d 105 (S.D.N.Y. 2013) ..............................................................Passim

*Meyer v. Concordia Int'l Corp.*,
  2017 WL 4083603 (S.D.N.Y. July 28, 2017) ........................................................ 21

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ................................................................................ 17

*P. Stolz Family P'ship L.P. v. Daum*,
  355 F.3d 92 (2d Cir. 2004) ................................................................................ 13

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ................................................................................ 23

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000) ................................................................................ 17

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994) ................................................................................ 20

*Slayton v. Am. Exp. Co.*,
  604 F.3d 758 (2d Cir. 2010) ................................................................................ 12

iv

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008) ................................................................................ 6

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008) ................................................................................ 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ................................................................................ 5, 6, 8, 17

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) ................................................................................ 9

*Turkish v. Kasenetz*,
  27 F.3d 23 (2d Cir. 1994) ................................................................................ 21

*Wilbush v. Ambac Fin. Grp., Inc.*,
  271 F. Supp. 3d 473 (S.D.N.Y. 2017) ................................................................ 10, 20

*Zhong Zheng v. Pingtan Marine Enter. Ltd.*,
  379 F. Supp. 3d 164 (E.D.N.Y. 2019) ................................................................ 23

## Statutes

15 U.S.C. § 78t(a) ................................................................................ 23

15 U.S.C. § 78u-4(b)(2) ................................................................................ 16

15 U.S.C. § 78u–5(c)(1)(B) ................................................................................ 12

## I.      PRELIMINARY STATEMENT

Defendants defrauded investors, falsely portraying Yangtze River Port and Logistics Limited ("Yangtze" or "Company") as a development firm working on an infrastructure project in China.[1] From the time that it began trading in the U.S. in December 2015, Yangtze repeatedly claimed in public filings that it had assets of approximately $400 million, and that its core business was the development of a major infrastructure project ("Port Logistics Center") under China's "One Belt One Road" initiative. Instead, Yangtze was a sham corporation with no real business operations, no material assets, and no Port Logistics Center project in which it was vested. The Company's actual purpose was to raise money on the public markets for the personal benefit of Defendant Liu, the Company's chief executive officer ("CEO"), chairman, and controlling shareholder. When Hindenburg Research published a report entitled "Yangtze River Port & Logistics: Total Zero. On-the-Ground Research Shows Assets Appear to be Largely Fabricated" ("Hindenburg Report") revealing this information to the public, shares of Yangtze dropped by nearly 29% in value in two trading days, damaging investors.

Defendants' Motion to Dismiss the Amended Class Action Complaint ("Motion") attempts to sanitize their fraud by attacking the credibility of the Hindenburg Report. Their arguments raise "factual dispute[s] . . . inappropriate for resolution on a motion to dismiss." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 405 (2d Cir. 2015). They also completely ignore that

---

[1] "Defendants" refers to Yangtze, Xiangyao Liu ("Liu"), Xin Zheng ("Zheng"), Tsz-Kit Chan ("Chan"), James Coleman ("Coleman"), and Harvey Leibowitz ("Leibowitz"). Collectively, Defendants Liu, Zheng, Chan, Coleman, and Leibowitz are the "Individual Defendants." Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint") (ECF No. 12), ¶¶30-31. Defendants express confusion about whether Defendants Coleman and Leibowitz are Defendants in this matter. *See* Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Class Action Complaint ("Def. Br.") at 1. The Complaint at issue names Coleman and Leibowitz as Defendants. ¶¶30-31. Accordingly, all arguments herein apply to them.

Lead Plaintiffs Michael Behrendsen and Marion Garcia ("Plaintiffs") carried out their own investigation, which forms the basis of the claims in the Complaint. For the following reasons, this Court should deny Defendants' Motion and allow this case to proceed to discovery.

## II.   STATEMENT OF FACTS

### A.   Yangtze Enters the U.S. Market

In December, 2015, Yangtze began trading on a United States exchange through a reverse merger with Kirin International Holding, Inc., a shell company that itself achieved a U.S. listing through a fraudulent "shell factory" enterprise that began in 2009. ¶¶36-40.[2] According to an 8-K that Defendants filed with the U.S. Securities and Exchange Commission ("SEC") on December 21, 2015, Yangtze's focus was the development of the Port Logistics Center, through its Chinese operating subsidiary, Wuhan Yangtze River Newport Logistics Co., Ltd. ("Wuhan Newport"). ¶¶3, 26, 40-41. Defendants told investors that the planned Port Logistics Center was strategically positioned in the anticipated "Free Trade Zone" of the Wuhan Port, an important trading window between China, the Middle East, and Europe, and would include a port operation area, warehouse and distribution area, cold chain logistics area, rail cargo loading area, exhibition area, and residential community. ¶¶42, 43. Yangtze's senior managers were Defendants Liu and Zheng, the Company's chief financial officer ("CFO").

When Yangtze began trading on U.S. markets, Defendants Coleman and Leibowitz joined the Company's Board. Coleman also became the Executive Director of Yangtze, as well as its chief representative in the United States, and the Company's U.S. office was (and continues to be) his New York City residence. ¶44. Leibowitz became an independent director of Yangtze and the

---

[2] "¶_" refers to the Complaint.

chair of the Audit Committee of the Board, lending his credibility as a U.S.-based banking executive to the Company. ¶45.

    **B.**    **Defendants Repeatedly Lie to Investors**

On February 2, 2016, Yangtze filed with the SEC its first annual report on Form 10-K as an operating company, providing its financial results and position for the fiscal year ended December 31, 2015. Defendants reported that the Company had approximately $400 million in assets, most of it in real property and land lots under development. ¶54. They also claimed to have leased over 1.2 million square meters of land for the development of their primary project, the Port Logistics Center, in Chunfeng Village. ¶55. The only structure that the Company claimed to have constructed was the Wuhan Centre China Grand Steel Market ("Steel Market"), which it also stated was still in the development process. ¶54. In addition, they assured investors that the Company was not involved in any litigation that could have a material adverse effect on its financial condition or results of operations. ¶57. Defendants continued to make substantially similar representations to investors throughout the Class Period, in quarterly reports and annual reports the Company filed with the SEC at regular intervals in 2016 and 2017, and the first three quarters of 2018, as well as a press release on April 17, 2017. ¶¶59-149.

The Company included in its periodic filings with the SEC during 2016 and 2017 certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that Defendants Liu and Zheng signed. In addition, Defendants Liu, Zheng, Coleman, and Leibowitz signed the Company's annual reports on Forms 10-K. ¶¶53, 59, 66, 73, 80, 89, 96, 105. After Defendant Chan replaced Zhang as Yangtze's CFO, beginning with the Company's annual report for the fiscal year ended December 31, 2017 ("2017 10-K") on March 9, 2018, each quarterly and annual report contained

SOX certifications that Defendants Liu and Chang signed. Defendants Liu, Chan, Coleman, and Leibowitz also signed the 2017 10-K. ¶¶114, 123, 132, 141.

Defendants' descriptions of the Company's assets, business operations, and involvement in potentially materially adverse litigation were materially false. In particular, neither Yangtze nor its operating subsidiary, Wuhan Newport, owned the Steel Market. Rather, in 2011 and 2012 several developers built the Steel Market about which Defendants boasted. Those developers experienced difficulties after one year, and at the time that Defendants touted the Steel Market as a valuable constructed project, not only was the Steel Market was empty, but local authorities were seeking new owners who would covert the property from a steel market to an office building and residential district. ¶¶15, 56, 63, 70, 77, 84, 93, 100, 109, 118, 127, 136, 145. Nor had Yangtze or Wuhan Newort leased any land or done any work to develop a Port Logistics Center at Chunfeng Village. Rather, Chunfeng is a small village with a total area of only 610,000 square meters, or 0.25 square miles – half the total area that Defendants claimed to have leased in that Village. Neither Yangtze nor Wufan Newport leased land in Chunfeng or in the villages of Junmin Village or Jiangdi Village that surround it. ¶¶16, 56, 84, 118, 152.

More, at no time during the Class Period did the Company have approximately $400 million in assets. Rather, neither Yangtze nor Wuhan Newport had any material assets. ¶¶54, 60-61, 67-68, 74-75, 81-82, 90-91, 97-98, 106-107, 115-116, 124-125, 133-134, 142-143. Chinese court records concerning litigation against Wuhan Newport reveal that by late 2017, Wuhan Newport had filed a bankruptcy petition and had so many claims and default judgments pending against it that it has been declared insolvent in China. ¶¶6, 19, 58, 65, 72, 79, 86, 95, 102, 104, 111, 113, 120, 122, 129, 131, 138, 140, 147, 149.

## C.    Defendants' Scheme Becomes Public

4

On December 6, 2018, before the market opened, Hindenburg Research published the Hindenburg Report. The Hindenburg Report revealed that Hindenburg had carried out an investigation into Yangtze that showed that Wuhan Newport was insolvent, the Port Logistics Center was a sham, the Steel Market was abandoned, nearly 80% of Yangtze's reported assets were verifiably fabricated, and that Yangtze was involved in numerous undisclosed legal proceedings, resulting in Chinese courts declaring Wuhan Newport to be insolvent. ¶¶151-154; Exhibit A. On this news, shares of Yangtze fell from an $11.62 per share closing price on December 4, 2018, the last trading day before the release of the Hindenburg Report, to an $8.28 closing price on December 7, 2018, falling nearly 29% in two trading days. ¶157.

## III.    ARGUMENT

### A.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In ruling on a 12(b)(6) motion, a court must accept all well-pleaded factual allegations as true, draw all reasonable inferences in plaintiff's favor, and determine whether the plaintiff may be entitled to relief under any reasonable reading of the complaint. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320–22 & n.4 (2007). A complaint need only contain "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" supporting the claims. *Id.* at 545.

To state a claim under Section 10(b) of the Exchange Act, a complaint must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between

the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (citation omitted).

### B. Defendants Improperly Demand that the Court Resolve Issues of Fact on the Pleadings

Contaminating each of their arguments, Defendants demand that this Court improperly resolve issues of fact, discounting the Complaint's allegations based on the Hindenburg Report and Plaintiffs' investigation. By asking the Court not to accept Plaintiffs' well-pleaded factual allegations as true, however, Defendants effectively concede that if the Court does accepts them as true, which it must, their Motion will fail.

The Supreme Court has admonished, however, that it is inappropriate for courts to resolve factual disputes at the pleading stage. *Tellabs*, 551 U.S. at 320–22 & n.4; *Fin. Guar. Ins. Co.*, 783 F.3d at 405; (2d Cir. 2015); *see also  Henry Avocado Corp. v. Z.J.D. Brother, LLC*, No. 17-CV-4559 (ARR), 2017 WL 6501864, at *5 (E.D.N.Y. Dec. 19, 2017) (an argument that relies on factual disputes cannot be resolved on a motion to dismiss). Accordingly, Defendants' attempt to dispute the accuracy of the Hindenburg Report by submitting to the Court their complaint against Hindenburg Research as Exhibit A to the Affirmation of Faun M. Phillipson ("Def. Aff."), which accompanies their Motion (ECF No. 15-1) is improper. *See* Def. Br. at 2.

First, and critically, even if the Court may take judicial notice of Defendants' complaint against Hindenburg Research, it is reversible error for it to accept as true the allegations in Yangtze's complaint. The Court may consider statements made in this complaint at the pleadings stage for the fact that it contains certain information, but it should not accept them for the truth of their contents. *See, e.g., Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (at the pleadings stage, courts may take judicial notice of the fact that press coverage, prior

lawsuits, or regulatory filings contained certain information, but not for the truth of their contents).

This distinction is critical. As the Ninth Circuit explained in its recent decision in *Khoja v.*

*Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018):

> The overuse and improper application of judicial notice and the incorporation-by-reference doctrine, however, can lead to unintended and harmful results….the unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery. This risk is especially significant in SEC fraud matters, where there is already a heightened pleading standard, and the defendants possess materials to which the plaintiffs do not yet have access.

(Internal citations omitted.)[3]

The Court should not permit Defendants to use their complaint against Hindenburg

Research to insert their own version of events into the complaint to defeat well-pleaded claims.

*Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156-57 (2d Cir. 2006) (finding

error where the district court considered matters outside plaintiff's complaint to form the basis of

a ruling in defendant's favor). The accuracy of the Hindenburg Report is a factual dispute that

cannot be resolved on a motion to dismiss. *McIntire v. China MediaExpress Holdings, Inc.*, 927

F. Supp. 2d 105, 125 (S.D.N.Y. 2013), quoting *In re China Educ. All., Inc. Sec. Litig.*, No. CV 10-

9239 CAS JCX, 2011 WL 4978483, at *4 (C.D. Cal. Oct. 11, 2011). The Complaint in no way

whatsoever references Defendants' complaint, so the Court may not accept Defendants' unfounded

allegations against Hindenburg Research as somehow having been incorporated in the Complaint

by reference.[4]

---

[3] For the same reasons, the Court should also not accept the twelve SEC filings that Defendants appended to their Motion to Dismiss for the truth of their contents. *See* Def. Br. at 14; Def. Aff. Exhibits B-R.

[4] Indeed, if the Court were to consider Defendants' allegations against Hindenburg Research in this case, it would provide an incentive for defendants in securities fraud cases to file potentially

In addition, Defendants have failed to properly request that the Court take judicial notice of the notice. *Abraham v. Town of Huntington*, No. 217CV03616ADSSIL, 2018 WL 2304779, at *9 (E.D.N.Y. May 21, 2018) (on a motion to dismiss, a defendant's decision to attach a document that is not referenced in the complaint as an exhibit to an affirmation rather than submitting a proper request for judicial notice is sufficient to prevent the court from taking judicial notice of the document) (citing *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1161 n.7 (S.D. Cal. 2008) (courts may not consider information that the complaint neither references or of which they may not take judicial notice). As such, not only does Second Circuit law prohibit the Court from considering Defendants' unfounded allegations for the truth of Defendants' assertions, but there is no reason for the Court to consider their complaint for any purpose whatsoever.

Defendants also improperly disparage the Complaint's well-pleaded allegations, arguing that Plaintiffs based them on "what an unnamed 'field investigator' learned in an attempt to suss out the Hindenburg Report's veracity, which was self-admittedly biased." Def. Br. 21. At this stage, the Court will accept as true Plaintiffs' allegations from its investigator ***on the ground*** in the People's Republic of China ("PRC"). *Tellabs*, 551 U.S. at 320–22 & n.4.[5] Plaintiffs' investigator's findings, confirming the Hindenburg Report's assertions in all material respects,

---

baseless lawsuits against reporters who discover their fraud.

[5] It is not clear why Defendants would find it suspicious that Plaintiffs would carry out an investigation into whether the Hindenburg Report's assertions were true, especially since they simultaneously disparage the Complaint's supposed reliance on the allegedly biased Hindenburg Report "as the gospel of truth." Def. Br. at 9. It is routine and responsible in securities fraud cases where a complaint accuses defendants of fraud for plaintiffs to retain investigators to visit a company's facilities, carry out interviews, and ensure that allegations in a potential lawsuit are well-supported. *See, e.g., McIntire*, 927 F. Supp. 2d at 126–27; *In re China Educ.*, 2011 WL 4978483 at *6-7.

provide the Court with corroboration of the Complaint's allegations from multiple sources. In turn, that corroboration establishes as well-pleaded those facts supporting the falsity and scienter elements of Plaintiffs' fraud claim. *See cf. City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 370–71 (S.D.N.Y. 2012) (corroborated scienter allegations are sufficient to survive a motion to dismiss). Given this inexorable conclusion, the Hindenburg Report together with Plaintiffs' investigator's corroboration of its assertions demonstrates not only that Defendants were lying, but that they were minimally reckless in their deceit.

### C.     Defendants Made Material and Actionable Misrepresentations

The Complaint's allegations adequately particularize that Defendants materially misled investors about Yangtze's business operations and financial results by making false statements about the Company's purpose, plans, and financial and legal status.

Under Rule 10b–5, parties responsible for public disclosures on behalf of public companies may not (1) "make any untrue statement of a material fact," or (2) "omit to state a material fact necessary in order to make the statements made ... not misleading." Courts determine whether a false statement is material based on a contextual analysis of facts and circumstances. *Matrixx Initiatives, Inc.*, 563 U.S. at 28. "The issue of materiality is a mixed question of law and fact." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). "Materiality is ordinarily an issue left to the factfinder and is therefore not typically a matter for Rule 12(b)(6) dismissal." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274 (3d Cir. 2004). At the pleading stage, a complaint cannot be dismissed on the ground that the material misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance. *Id.* at 275 (citations omitted) (reversing the district court's finding that the fact that there was a "gray" unauthorized market for the defendant

company's products was not a material omission, where plaintiffs alleged that short-term income generated by gray market sales skewed the company's overall financial appearance).

Defendants materially misled investors regarding Yangtze's alleged assets, the development of the alleged Port Logistics Center project and Steel Market, and numerous undisclosed legal proceedings. *See, e.g.,* ¶¶151-154. They now attempt to evade liability for these material false statements and omissions by arguing that the Complaint fails to allege falsity, first because Plaintiffs' allegations regarding the Company's assets are not pled properly, and second because Plaintiff's remaining allegation are inactionable forward-looking statements. Both arguments are without merit.

        1.    **The Complaint Adequately Pleads Material False Statements and Omissions Regarding Yangtze's Reported Assets**

Defendants argue that the Complaint does not properly plead that Defendants made materially false statements and omissions regarding Yangtze's reported assets. Def. Br. at 12-13. They are wrong.

Defendants assert that because the Complaint does not allege that Yangtze's financial statements violated provisions of Generally Accepted Accounting Principles ("GAAP"), it provides only a "bare allegation of supposedly misleading financial statements alone" that falls short of alleging a misstatement or omission. Def. Br. at 12-13. Defendants' argument, however, relies on case law that addresses allegations of improper ***valuations*** of company assets that actually existed – not the question of the ***existence*** of assets. *See Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 488 (S.D.N.Y. 2017) (plaintiff alleged that defendants' failure to disclose the amount of the interest owed on certain bonds that they insured was misleading, but did not explain how the failure to make that disclosure violated GAAP); *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 160 (S.D.N.Y. 2015) (plaintiff alleged that the defendant's financial statements

were misleading because they did not properly classify and record $289.9 million in losses, but did not allege that this failure violated a specific GAAP provision or industry standard); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 376 F. Supp. 2d 443, 447 (S.D.N.Y. 2005) (defendants had misrepresented the value of certain assets but complaint failed to "allege that the differences in valuations were outside the range of what was considered normal in the industry"). These cases are inapposite here where the Complaint alleges not that Defendants lied, merely inflating the value of a working asset, but that neither the Company nor Wuhan Newport actually owned the land assets they claimed. Defendants cite no case requiring a complaint's falsity allegations to include a GAAP violation.

It is certain that Defendants overstated the value of the Company's assets on the balance sheets they disclosed during the Class Period. Whether they complied with GAAP, however, is quite beside the point. For before assessing and disclosing the value of an asset that eventually may constitute a GAAP violation, a company must actually have some right to include that asset as part of its operations. Here, that Defendants inflated assets on the Company's balance sheet is secondary to their lying about owning those assets. To credit Defendants' arguments is to elevate a GAAP violation above the federal securities laws' express prohibition against deceiving the investing public. The Complaint's omission of an allegation that Defendants violated GAAP is irrelevant in the context of their far more material deceit of any meaningful operations at all.

Yangtze repeatedly told investors that it had approximately $400 million in assets, mostly consisting of real estate properties and land lots under development. *See, e.g.,* ¶54. But these assets were a fiction. *Id.* The Complaint alleges that PRC court records show that Wuhan Newport (and therefore Yangtze) has had no assets in China since the second half of 2017 at the latest, when it had filed a bankruptcy petition, and had so many claims and default judgments pending against it

that it had been declared insolvent. *See, e.g.,* ¶¶58, 104, 120. Any assets that it may have had at one time were frozen in 2016. ¶¶54, 61. These allegations adequately plead that Yangtze claimed an interest in hundreds of millions of dollars in real estate in which it had none. Such a discrepancy between information that exists in the PRC and the Company's public filings with the SEC suffice to plead falsity adequately. *See McIntire*, 927 F. Supp. 2d at 125 (finding that plaintiff adequately alleged falsity by alleging discrepancies between filings in China and the United States as well as additional evidence of falsity alleged in analyst and news reports).

### 2.   The PSLRA's Safe Harbor Does Not Protect Defendants' False Statements and Omissions Because They Were not Forward Looking

Defendants next argue that their false statements regarding the Company's business operations and involvement in litigation are inactionable because they were forward looking statements. Contrary to Defendants' apparent theory, however, neither cautionary language nor the use of phrases like "is expected" and "is believed" excuses them from liability for materially false statements and omissions that they knew or recklessly disregarded were false when made. *See* Def. Br. at 14-15.

Under the PSLRA, certain forward-looking statements qualify for safe harbor treatment and are protected from § 10(b) and Rule 10b–5 liability. *See, e.g., Slayton v. Am. Exp. Co.*, 604 F.3d 758, 762 (2d Cir. 2010). The safe harbor, however, applies only to forward-looking statements and not to statements of historical or present fact. *Illinois State Bd. of Inv. v. Authentidate Holding Corp.*, 369 F. App'x 260, 264 (2d Cir. 2010); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 568 (S.D.N.Y. 2011) ("[T]he safe harbor ... do[es] not apply to statements of present or historical facts."). Nor will a forward-looking statement qualify for safe harbor treatment if it was made with actual knowledge that it was false and misleading. *Slayton*, 604 F.3d at 762 (citing 15 U.S.C. § 78u–5(c)(1)(B)). For example, in *In*

12

*re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 247-249 (2d Cir. 2016), the Court explained that providing guidance that conflicts with internal forecasts makes such guidance knowingly false.

Defendants' characterization of apparently all of the contents of their financial statements other than their reporting of Yangtze's assets as forward-looking is wrong. It ignores that the Company's financial statements included numerous materially false statements and omissions of current and historical fact that rendered even statements of future expectations knowingly false. As such, cautionary language cannot shield Defendants from liability. *See, e.g., P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language"); *Vivendi*, 765 F.Supp. 2d at 569 ("[T]he safe harbor does not protect statements which are misleading about historical and present facts at the time they are made, and whose misleading nature can be verified at the time they are made, simply because the statements are couched as predictions of future events.").

For example, the chart that Defendants present at Def. Br. at 14-15 suggests that all of the statements contained in the 2015 10-K other than their reports of Yangtze's assets are forward-looking because the phrase "is expected" appears in a description of Yangtze's alleged plan for the Port Logistics Center's warehouses. ¶55. The passage in the 2015 10-K that describes the warehouse plan also contains numerous statements of present and historical fact, including that Wuhan Newport had leased over 1.2 million square meters of land in Chunfeng Village for development, it had obtained land use rights to own 500,000 square meters of commercial lands on which it would build a 700,000 square meter complex, and that the Port Logistics Center is an

extensive complex located in Wuhan. *Id.*[6] The Complaint adequately alleges that none of these statements of present and historical was true.

Yangtze had no future because, at the time, it had no operating or asset present or past. Rather, it was a house of cards without the cards. Wuhan Newport had not rented land to develop in Chunfeng Village, it did not have real estate assets, and the Port Logistics Center did not exist. ¶56. In that context, any statement of management expectations about the Port Logistics Center's warehouses was also knowingly false, as Defendants knew or recklessly disregarded that the Port Logistics Center was not a real development. Similarly, Defendants repeatedly use "is believed" to refer to the Port Logistics Center's potentially strategic location. *See, e.g.,* ¶62. They do so in the context of similar false descriptions of the non-existent Port Logistics Center and Wuhan Newport's fictional real estate holdings, which are false statements of present and historical fact and which, in context, render even their stated beliefs to be knowingly false. *Id.* A fair reading of every single statement that Defendants try to paint as forward-looking leads to the same conclusion. ¶¶69, 76, 83, 92, 99, 108, 117, 126, 135, 144.

Defendants' falsity arguments also ignore entirely their failure to disclose litigation that materially adversely affected Yangtze's financial condition and operations. *See, e.g.,* ¶¶58, 104. Defendants failed to disclose numerous legal proceedings, including that any assets it may have had at one time were frozen in 2016, by July 2017, Wuhan Newport had filed a bankruptcy petition, and by November 2017, it had so many claims and default judgments pending against it that it has been declared insolvent in the PRC. *Id.; see also, e.g.,* ¶¶54, 61, 68. After Wuhan Newport's bankruptcy filing, these omissions also rendered materially false the Company's risk disclosures

---

[6] As discussed in the Statement of Facts, *supra,* substantially similar statements appear in each of the Company's financial statements throughout the Class Period.

regarding the risk of liquidation proceedings, *see, e.g.,* ¶103, as the risk had materialized. As such, these risk disclosures, themselves, are actionably false. *In re Facebook IPO Sec. and Deriv Litig.*, 986 F.Supp.2d 487, 516 (S.D.N.Y. 2013) ("Courts in this Circuit have held that a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized."), *citing In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("risk disclosures… are misleading if the risks are professionally stamped in internal undisclosed analyses ... as significantly greater or more certain than those portrayed in the prospectus."), *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) ("[G]eneric risk disclosures are inadequate to shield defendants from liability for failing to disclose known specific risks.").

Last, Defendants' argument that the Complaint does not properly plead that they made materially false statements in Yangtze's April 19, 2017 press release ("April 19, 2017 Press Release"), which they also claim to be a forward-looking statement, makes no sense. The Complaint pleads that the following passage in the April 19, 2017 Press Release was false and misleading:

> Yangtze River Development Limited primarily engages in the business of real estate development with ***a port logistic project located in the middle reaches of the Yangtze River.*** Wuhan Newport is a ***large infrastructure development project implemented under China's latest "One Belt One Road" initiative*** and is strategically positioned in the "Free Trade Zone" of the Wuhan Port, a crucial trading window between China, the Middle East and Europe. To be fully developed upon completion of three phases, within the ***logistics center,*** there will be six operating zones, including port operation area, warehouse and distribution area, cold chain logistics area, rail cargo loading area, exhibition area and residential community. The ***logistics center*** is also expected to provide a number of shipping berths for cargo ships of various sizes. Wuhan Newport is expected to provide domestic and foreign businesses a direct access to the anticipated Free Trade Zone in Wuhan. The ***project*** will include commercial

> buildings, professional logistic supply chain centers, direct access
> to the Yangtze River, Wuhan-Xinjiang-Europe Railway and
> ground transportation, storage and processing centers, IT
> supporting services, among others.

¶¶87. (Emphasis added). This paragraph was false and misleading because neither Yangtze nor Wuhan Newport was, in fact, developing the Port Logistics Center. Contrary to Defendants' bizarre claim that the April 19, 2017 Press Release "never mentions the 'Port Logistics Center,'" Def. Br. at 18, not only did Defendants mention the development of the Port Logistics Center in that paragraph repeatedly but that development is its entire subject. Much like Defendants' false statements concerning the supposed development of the Port Logistics Center in their financial statements, the fact that the Port Logistics Center was a fiction renders false their supposed expectations for the nonexistent project. *See, e.g., Vivendi*, 765 F.Supp. 2d at 569.

There is simply no support (and Defendants cite none) for the idea that the use of phrases such as "is expected" and "is believed" as well as cautionary language in SEC filings can somehow sanitize Defendants' knowing and/or reckless materially false statements and omissions regarding Yangtze's operations, results, and involvement in legal proceedings. As such the PSLRA's safe harbor is inapplicable and the Complaint has adequately pleaded the falsity of Defendants' Class Period statements.

### D.      The Complaint Adequately Alleges a Strong Inference of Scienter

Defendants also assert that the Complaint fails adequately to plead their scienter.

Under the PSLRA, to plead scienter adequately, a complaint must allege facts that, when viewed holistically, give rise to a strong inference that the defendant acted with "the required state of mind." 15 U.S.C. § 78u-4(b)(2).  To plead scienter in a securities fraud claim, a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit

16

fraud. *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (citation omitted). "Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001)    (citing *Novak    v. Kasaks*, 216 F.3d 300, 308, 311 (2d Cir. 2000). Alternatively, a complaint adequately pleads a reckless omission if it alleges that defendants "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Novak*, 216 F.3d at 308; *see also In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp.2d 423, 486 (S.D.N.Y. 2011) (quoting *Novak*, 216 F.3d at 311). "An egregious refusal to see the obvious" is a hallmark of recklessness. *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 40 (2d Cir. 2000).

Courts assessing scienter must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323 (emphasis in original). An inference of scienter is "strong" if it is "cogent and compelling" and "*at least as likely* as any plausible opposing inference." *Id.* at 324, 328 (emphasis in original). The inference of scienter need not be more likely than a plausible opposing inference; the tie goes to the plaintiff. *Id.* at 324. Indeed, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* (internal citation omitted). In addition, while generally the most straightforward way to raise an inference of scienter for a corporate defendant is to plead it for an individual defendant whose intent could be imputed to the corporation, it is also possible to plead an inference of corporate scienter directly. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195–96 (2d Cir. 2008).

17

The Complaint pleads in detail that the Individual Defendants knew or should have known that their outright lies regarding Yangtze's operations, results, and involvement in legal proceedings were misleading investors. The Complaint adequately pleads that Yangtze had no material assets and operations. Defendants' argument that the Complaint fails to allege particularized facts demonstrating that the Individual Defendants knew that Wuhan Newport was not developing the Port Logistics Center and was insolvent, with no land assets, and numerous judgments against it in PRC courts, fails utterly to parry the Complaint's well-pleaded allegations. *See* Def. Br. at 20-22.

First, the Complaint pleads numerous strong indications of corporate scienter on the part of Yangtze. For example, the Complaint alleges that Yangtze claimed that Wuhan Newport was developing the Port Logistics Center on 1.2 million square meters of land leased in Chunfeng Village and was developing the Steel Market, but the Complaint adequately pleads that the Port Logistics Center Defendants claimed the Company was developing did not exist and that Company did not develop the Steel Market that was, during the Class Period, empty, with the local government seeking new ownership for the properties. *See, e.g.,* ¶¶8, 55, 83, 117, 152. It also alleges that Yangtze claimed to have approximately $400 million in assets throughout the Class Period, but Wuhan Newport had actually filed a bankruptcy petition in China in 2017. *See, e.g.,* ¶¶54, 104. In other words, Yangtze told U.S. investors that it had $400 million in assets while telling a PRC court that it had none.

This case is on all fours with *McIntire*, 927 F. Supp. 2d at 126–27, in which the Court found that plaintiffs pled corporate scienter where the defendant company reported drastically different income and revenue figures in the U.S. and China and investigators who visited the company's facilities found that no employees were actually working there. Similarly, in *In re China Educ.*,

2011 WL 4978483 at *6-7, the Court found that plaintiffs established corporate scienter where the defendant company reported disparate revenue figures in the U.S. and China and a visit to an alleged "state-of-the-art" facility in China revealed an empty building that witnesses told plaintiffs' investigator the defendant company did not even own. Accordingly, by pleading that Yangtze reported disparate assets to U.S. and PRC authorities and that the operations they touted did not exist, the Complaint adequately alleges the Company's scienter.

Second, the Complaint raises a strong inference that that the Individual Defendants made statements that they, themselves, knew or should have known were false. Yangtze claimed that its central project was the Port Logistics Center, which it was developing on the real estate properties and land lots under development that made up most of its stated assets. ¶¶3, 26, 40-41. Defendant Liu was Yangtze's CEO, chairman, and controlling shareholder throughout the Class Period. ¶27. Defendants Zhen and Chan each served as Yangtze's CFO. ¶¶28-29. Defendant Coleman was the executive director of Yangtze's board and its chief representative in the U.S.; his apartment served as the Company's U.S. office. ¶¶30, 44. Defendant Leibowitz, a Yangtze director, chaired the Company's Audit Committee throughout the Class Period. ¶¶31, 45. As Yangtze's key management, before speaking to investors about Yangtze's operations and results, the Individual Defendants minimally had a duty to ensure that the Port Logistics Center and the Company's land holdings, which formed its stated core operations, existed in the first place. ¶¶3, 26, 40-41. "When a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operations of the company supports the inference that the defendant knew or should have known the statements were false when made." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004); *see also In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 335 (S.D.N.Y. 2014) (finding allegations that

19

defendant "was a small company that focused on the production of just one product" and that defendants' "public statements evinced a familiarity with the data in the trials" supported inference that defendants "knew and/or had access to facts that contradicted their public statements"). Because the Port Logistics Center and Yangtze's land holdings supposedly formed the foundation of the Company's business, the fact that the Individual Defendants misled investors about them raises a strong inference of scienter.

Finally, while Plaintiffs are not required to plead motive given that the Complaint demonstrates strong circumstantial evidence of conscious misbehavior or recklessness, they do allege motive and opportunity on the part of Defendant Liu. When pleading scienter based on motive and opportunity, "[m]otive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994). Defendants do not contest that as Yangtze's CEO, Liu had the opportunity to commit the alleged fraud, but argue that the absence of reported stock sales by Liu at "opportune" times entirely refutes that he had a motive to do so. *See* Def Br. at 22-23. This argument is a red herring.

The Complaint pleads that Liu claimed to have made "advances" to the Company that it used proceeds from capital raises to repay. ¶¶5, 11, 156. In other words, Liu did not profit from selling his own stock, but from being repaid for purported loans using capital raised through selling convertible notes. *See* Exhibit A; *see also* Def. Aff. Exhibit Q at F-1. Liu's motive to artificially inflate Yangtze's stock price was therefore to be able to continue to collect repayment of purported "advances," a financial motive that is certainly not "possessed by most corporate directors and officers." Def. Br. at 22, *quoting Wilbush*, 271 F. Supp. 3d at 485. This concrete personal benefit

20

sufficiently pleads Liu's motive to defraud investors. *See, e.g., Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 455 (S.D.N.Y. 2007) (the financial benefit of selling a business established motive to commit fraud); *Meyer v. Concordia Int'l Corp.*, No. 16 CIV. 6467 (RMB), 2017 WL 4083603, at *6–7 (S.D.N.Y. July 28, 2017) (same); *Turkish v. Kasenetz*, 27 F.3d 23, 28 (2d Cir. 1994) (a desire to avoid repaying loans and end previous litigation is motive for fraud).

Put simply, Yangtze was a scam. Defendants raised money by lying to investors, claiming to be an infrastructure development firm, when their core project was a fiction and their claimed land assets nonexistent. If Defendants did not know that the Company had neither operation nor material asset, then they were minimally reckless. Where Defendants knowingly and/or recklessly disclose information that falsely described the Company's core operations because the stated core operation did not actually exist, the Court should find a reasonable inference of scienter against each of the individuals involved as well as the Company itself.

### E.    The Complaint Adequately Pleads Loss Causation

In the face of the Complaint's adequate allegations that Yangtze was a complete sham, Defendants' arguments about falsity and scienter wither and perish. Unconvinced by their own prose, therefore, they assert that the Complaint fails adequately to plead loss causation. This jab, too, fails to land. The Complaint alleges material misrepresentations, a corrective disclosure, and the resulting decline in Yangtze's stock price. ¶¶151-154, 157. The Second Circuit requires no more to allege loss causation adequately.

A complaint adequately alleges loss causation by pleading a corrective disclosure to which the market reacted negatively. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005); *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014). "There is no heightened standard for pleading loss causation." *Freudenberg v. E*Trade*

*Fin.   Corp.*,   712   F.   Supp.   2d   171,   202   (S.D.N.Y.   2010),   citing *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 163 (S.D.N.Y. 2008).

The Complaint pleads that the Hindenburg Report was a corrective disclosure. The Hindenburg Report informed investors that the Port Logistics Center was a sham, and most of Yangtze's reported assets were fabricated. ¶¶151-154. As a result, the Company's stock price dropped nearly 29% in two trading days. ¶157. These straightforward allegations render Defendants' feigned confusion about Plaintiffs' loss causation theory specious, and their argument that the Complaint fails to allege loss causation based on materialization of risk misplaced. *See* Def. Br. at 5-8.

Defendants' argument that the Hindenburg Report cannot be a corrective disclosure because Hindenburg Research had a short position in Yangtze, is meritless.[7] First, misunderstanding the law on pleading loss causation, Defendants prompt this Court to disbelieve the Hindenburg Report, tacitly arguing that it cannot correct what they assert are their true statements. Even if this accurately reflected the law--and it does not--once again, the Complaint adequately supports the Hindenburg Report's assertions, corroborating them with allegations from an investigator on the ground in the PRC. The Court will, therefore, take the allegations from Hindenburg Report, as Plaintiffs' investigator corroborated them, as true. As a matter of fact, therefore, the Court will find that the Hindenburg Report was corrective in nature, disclosing for the first time that Yangtze was a sham.

More, whether Hindenburg revealed information, exposing Defendants' misstatements and causing the price of Yangtze to plummet, is wholly distinct from the issue of any potential prejudice it may have harbored against Yangtze. That is, a short position in a company's stock

---

[7] Hindenburg did not hide its short position, prominently disclosing it in the report. *See* Exhibit A.

may be relevant to the biases and reliability of the author, but the accuracy of the report is a factual dispute that courts must avoid resolving on the pleadings. *McIntire*, 927 F. Supp. 2d at 125, quoting *In re China Educ.*, 2011 WL 497848 at \*4; *see also Ho. v. Duoyuan Global Water, Inc.*, 887 F.Supp.2d 547, 564 (S.D.N.Y. 2012) ("Even though Defendants claim that [the research group that issued a report, which may have held a short position in the company's stock] is a biased party, and that it openly admits the possible inaccuracy of the Report, the reliability of the report is a question of fact.") (internal quotation omitted). Notwithstanding its position in Yangtze's securities, no case prevents a short seller's report from constituting a corrective disclosure if it reveals for the first time material information about a company, exposing the company's material misstatements and causing a material decline in the price of the company's securities prices. *See, e.g., In re Winstar Commc'ns*, No. 01 CV 11522, 2006 WL 473885, at \*12–15 (S.D.N.Y. Feb. 27, 2006).[8] Because the Hindenburg Report revealed Defendants' fraud, triggering a drop in the Company's stock price, the Court will find it was a corrective disclosure.

### F.    Plaintiffs Adequately Pled Control Person Liability

Because the Complaint adequately alleges a primary violation of § 10(b) and Rule 10b-5 and the Individual Defendants controlled Yangtze, Plaintiffs have adequately alleged a *prima facie* case under § 20(a). *See* 15 U.S.C. § 78t(a); *see also  Rombach v. Chang*, 355 F.3d 164, 177–78

---

[8] *Zhong Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164 (E.D.N.Y. 2019) is inapposite. There, this Court confronted a truth-on-the-market defense, finding that an article questioning a company's value based on the company's own previous SEC filings and other news reports going back two years disclosed nothing new to the market. An article that discloses nothing new cannot constitute a corrective disclosure. *Id.* at 178–79. For this to apply, Defendants would have to refer to information from their own public disclosures that informed the market that Yangtze was a sham. They point to no such disclosure. Hindenburg based its assertions on on-the-ground research calling into question all of Yangtze's claims concerning its operations. ECF No. 12-1; ¶¶151-156. This was new information that caused Yangtze's shares to drop nearly 29% in two trading days. ¶157.

(2d Cir. 2004); *Elliott Assocs., L.P. v. Hayes*, 141 F. Supp. 2d 344, 360–61 (S.D.N.Y. 2000), *aff'd*,

26 Fed. Appx. 83 (2d Cir. 2002).

## IV.     CONCLUSION

For all the above reasons, this Court should deny Defendants' Motion to Dismiss in its

entirety.

Dated: September 10, 2019                              Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/Phillip Kim
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com

/s/Leah Heifetz-Li
Leah Heifetz-Li
Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Fax: (212) 202-3827
Email: lheifetz@rosenlegal.com
        jgoldberg@rosenlegal.com

*Lead Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 3, 2019, the foregoing was served via email and U.S.

first class mail, upon the following:

Jonathan Uretsky
Faun M. Phillipson
Phillipson & Uretsky, LLP
111 Broadway, 8th Floor
New York, New York 10016
uretsky@pullp.com
phillipson@pullp.com


Dated: September 3, 2019                    /s/ *Leah Heifetz-Li*
                                            Leah Heifetz-Li

25