UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- x
MICHAEL BEHRENDSEN and MARION    :
GARCIA,                               :                 **OPINION AND ORDER**
                                      :         19-cv-00024 (DLI)(LB)
                    Plaintiffs,     :
                                        :
         -against-               :
                                        :
YANGTZE RIVER PORT AND LOGISTICS   :
LIMITED, XIANGYAO LIU, XIN ZHENG,    :
TSZ-KIT CHAN, JAMES COLEMAN, and    :
HARVEY LEIBOWITZ               :
                                        :
                    Defendants.   :
---------------------------------------------------------- x

**DORA L. IRIZARRY, United States District Judge:**

Plaintiffs Michael Behrendsen ("Behrendsen") and Marion Garcia ("Garcia" and, collectively, "Plaintiffs") bring this proposed securities class action based on a December 6, 2018 article published by Hindenburg Research entitled "Yangtze River Port & Logistics: Total Zero. On-the-Ground Research Shows Assets Appear to be Largely Fabricated" (the "Hindenburg Report"), which allegedly caused a 29 percent drop in the stock price of Defendant Yangtze River Port and Logistics Limited ("Yangtze"). Plaintiffs seek relief under § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against Xiangyao Liu ("Liu"), Xin Zheng ("Zheng") Tsz-Kit Chan ("Chan"), James Coleman ("Coleman"), Harvey Leibowitz ("Leibowitz") (collectively, the "Individual Defendants"), and Yangtze (together with the Individual Defendants, "Defendants") and under § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), against the Individual Defendants.

On June 3, 2019, Plaintiffs filed an Amended Complaint. *See*, Am. Compl., Docket ("Dkt.") Entry No. 12. On July 17, 2019, Defendants moved to dismiss the Amended Complaint,

pursuant to Federal Rule of Civil Procedure 12(b)(6). *See*, Mot. to Dismiss for Failure to State a Claim, Dkt. Entry No. 13; Mem. of Law in Supp. of Defs.' Mot. to Dismiss the Am. Class Action Compl. ("Def. Mem."), Dkt. Entry No. 14; Decl. of Faun M. Phillipson in Supp. of Defs.' Mot. to Dismiss ("Phillipson Decl."), Dkt. Entry No. 15. Plaintiffs opposed the motion. *See*, Lead Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss ("Pl. Opp'n"), Dkt. Entry No. 18. Defendants replied. *See*, Defs.' Reply Mem. of Law in Further Supp. of Mot. to Dismiss the Am. Class Action Compl. ("Def. Reply"), Dkt. Entry No. 19.

For the reasons set forth below, Defendants' motion to dismiss Plaintiffs' § 10(b) claim is granted as to Defendants Zheng, Chan, Coleman, and Leibowitz and denied as to Defendants Liu and Yangtze, and Defendants' motion to dismiss Plaintiffs' § 20(a) claim against the Individual Defendants is granted as to Defendants Zheng, Chan, Coleman, and Leibowitz and denied as to Defendant Liu.

## BACKGROUND

The following allegations of fact are taken from the Amended Complaint, as well as documents that are incorporated by reference, and are accepted as true for purposes of this decision. *See*, *DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87 (2d Cir. 2013). In support of their motion to dismiss, Defendants submitted copies of their filings with the Securities and Exchange Commission ("SEC") and the press release, which are at issue in this action. *See*, Phillipson Decl., Dkt. Entry Nos. 15-2 to 15-18. The Court considers these exhibits because they are incorporated by reference in the Amended Complaint. *See*, *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (A complaint is "deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint.") (internal quotation marks and

citations omitted).

This proposed securities class action is based on the December 6, 2018 Hindenburg Report, which Plaintiffs allege caused a 29 percent drop in Yangtze's stock price. Am. Compl. ¶¶ 7-12. Plaintiffs claim to have purchased Yangtze's securities during the putative class period of February 2, 2016 through December 5, 2018 and seek certification of a purported class. *Id.* at ¶¶ 1, 159-67.

Defendant Yangtze is a Nevada corporation with headquarters in New York City, that is traded on the NASDAQ stock exchange under the ticker symbol "YRIV." *Id.* at ¶ 26. When Yangtze began trading on U.S. Markets in December 2015, it represented that it was developing an infrastructure project (the "Port Logistics Center") through its Chinese operating subsidiary, Wuhan Yangtze River Newport Logistics Co., Ltd. ("Wuhan Newport"), which it believed to be strategically positioned in an important trading window between China, the Middle East, and Europe and would provide shipping berths for cargo ships, residential and commercial buildings, professional logistic supply chain centers, and direct access to the Yangtze River and the Wuhan-Xianjiang-Europe Railway. *Id.* at ¶¶ 3, 42.

Defendant Liu was Yangtze's Chief Executive Officer ("CEO") and Chairman of the Board of Directors during the putative class period. *Id.* at ¶ 27. Defendant Zheng served as Yangtze's Chief Financial Officer ("CFO") from the beginning of the putative class period until May 2017, and Defendant Chan has served as Yangtze's CFO since May 2017. *Id.* at ¶¶ 28-29. Defendant Coleman was Yangtze's Executive Director of the Board of Directors and Chief Representative in the United States during the putative class period. *Id.* at ¶ 30. Defendant Leibowitz served as Yangtze's chair of the Board of Director's Audit Committee during the putative class period. *Id.* at ¶ 31.

Plaintiffs allege that Defendants deceived investors by making materially false or

misleading statements or omissions. Plaintiffs identify the following public filings that contain purportedly false and misleading statements concerning Yangtze's financial condition and operations: (1) Yangtze's 2015 Form 10-K Annual Report ("2015 10-K"); (2) Yangtze's Form 10-Q for three quarters of 2016 ("2016 10-Q") and 2016 Form 10-K Annual Report ("2016 10-K"); (3) Yangtze's Form 10-Q for three quarters of 2017 ("2017 10-Q") and 2017 Form 10-K Annual Report ("2017 10-K"); (4) Yangtze's Form 10-Q for three quarters of 2018 ("2018 10-Q"); and (5) an April 17, 2017 press release (the "Press Release"). *Id.* at ¶¶ 53-149.

Yangtze's 10-Ks and 10-Qs represented that Yangtze had anywhere from $379,711,509.00 to $422,448,212.00 in assets, the majority of which were in "real estate properties and land lots under development." *Id.* at ¶ 54 (2015 10-K representing $406,986,613.00 in assets); *Id.* at ¶ 60 (2016 Q1 10-Q representing $408,714,969.00 in assets); *Id.* at ¶ 67 (2016 Q2 10-Q representing $396,030,739.00 in assets); *Id.* at ¶ 74 (2016 Q3 10-Q representing $394,834,633.00 in assets); *Id.* at ¶ 81 (2016 10-K representing $379,711,509.00 in assets); *Id.* at ¶ 90 (2017 Q1 10-Q representing $383,138,526.00 in assets); *Id.* at ¶ 97 (2017 Q2 10-Q representing $389,398,732.00 in assets); *Id.* at ¶ 106 (2017 Q3 10-Q representing $397,418,107.00 in assets); *Id.* at ¶ 115 (2017 10-K representing $406,697,070.00 in assets); *Id.* at ¶ 124 (2018 Q1 10-Q representing $422,448,212.00 in assets); *Id.* at ¶ 133 (2018 Q2 10-Q representing $400,393,661.00 in assets); *Id.* at ¶ 142 (2018 Q3 10-Q representing $386,276,641.00 in assets). Additionally, the 10-Ks and 10-Qs noted that Yangtze was not involved in any litigation that could have a material adverse effect on its financial condition or results of operation. *Id.* at ¶¶ 57, 64, 71, 78, 85, 94, 101, 110, 119, 128, 137, 146. The 2017 and 2018 SEC filings also stated that Yangtze "may be materially and adversely affected if [Wuhan Newport] declares bankruptcy or becomes subject to a dissolution or liquidation proceeding." *Id.* at ¶¶ 103, 112, 121, 130, 139, 148.

With respect to Yangtze's developments, the 2015 10-K stated in pertinent part:

One of the main projects of our Company is the [Port Logistics Center], which is an extensive complex that is located in Wuhan, the capital of Hubei Province in China, a major transportation hub with dozens of railways, roads and expressways passing through the city and connecting to major cities in Mainland China, with connections to international centers of commerce and business.

\*\*\*

Wuhan Newport has signed an agreement to rent 1.2 million square meters of land on a long[-]term basis for building logistics warehouses covering 400,000 square meters in support of the new port. The warehouses [are] expected to comprise of port terminal zones, warehouse logistics zones, cold chain supply zones and railroad loading and unloading zones. The warehouses, once constructed, will connect the port terminal along the Yangtze River and the railway leading to Europe, satisfying the requirement of China's latest "One Belt, One Road" initiative. It will also be able to support large logistics companies in Wuhan and other nearby provinces that lease the warehouses, terminals and offices.

\*\*\*

Taking into consideration the Comprehensive Bonded Zone and Free Trade Zone status of the [Port Logistics Center], Wuhan Newport has obtained the land use rights to own approximately 500,000 square meters of commercial lands on which Wuhan Newport will build a mixed residential and office complex of approximately 700,000 square meters. As of the date of this Annual Report, mixed-use complex totaling approximately 100,000 square meters have been completed and there are outstanding 600,000 square meters to be constructed in three phases within the next five (5) years.

\*\*\*

As of December 31, 2015, the sole developing project is called Wuhan Centre China Grand Steel Market (Phase 1) Commercial Building in Wuhan Yangluo Economic Development Zone with approximately 222,496.6 square meters of total construction area.

*Id.* at ¶ 55; *See also*, Phillipson Decl., Ex. B, 4, 5, 19, 60 (2015 10-K).

The 2016, 2017, and 2018 10-Qs and the 2016 and 2017 10-Ks made the following representations regarding Yangtze's developments:

Situated in the middle reaches of the Yangtze River, Wuhan Newport is a large infrastructure development project implemented under China's latest "One Belt[,] One Road" initiative and is believed to be strategically positioned in the anticipated "Pilot Free Trade Zone" of the Wuhan Port, a crucial trading window among China, the Middle East and Europe. To be fully developed upon completion, within the [Port Logistics Center], there will be six operating zones: including port operation area, warehouse and distribution area, cold chain logistics area, rail cargo loading area, exhibition area and business[-] related area. The [Port Logistics Center] is

also expected to provide a number of shipping berths for cargo ships of various sizes. Wuhan Newport is expected to provide domestic and foreign businesses a direct access to the anticipated Free Trade Zone in Wuhan. The project will include commercial buildings, professional logistic supply chain centers, direct access to the Yangtze River, Wuhan-Xinjiang-Europe Railway and ground transportation, storage and processing centers, IT supporting services, among others.

Our [Port Logistics Center] is an extensive complex located in Wuhan, the capital of Hubei Province of China, a major transportation hub city with access to numerous railways, roads and expressways passing through the city and connecting to major cities in China, as well as other international centers of commerce and business.

The [Port Logistics Center] is expected to occupy approximately 1,918,000 square meters . . .

***

Wuhan Newport has signed a twenty-year lease agreement, maximum number of years permitted by the applicable PRC laws, and with rights to renew at its sole discretion effective April 27, 2015 to lease approximately 1,200,000 square meters of land for building logistics warehouses in support of the [Port Logistics Center].

***

. . . [T]he sole developing project is called Wuhan Centre China Grand Steel Market (Phase 1) Commercial Building in Wuhan Yangluo Economic Development Zone with approximately 222,496.6 square meters of total construction area.

*Id.* at ¶¶ 62, 69, 76, 83, 92, 99, 108, 117, 126, 135, 144.

Finally, the Press Release stated:

Yangtze River Development Limited primarily engages in the business of real estate development with a port logistic project located in the middle reaches of the Yangtze River. Wuhan Newport is a large infrastructure development project implemented under China's latest "One Belt[,] One Road" initiative and is strategically positioned in the "Free Trade Zone" of the Wuhan Port, a crucial trading window between China, the Middle East and Europe. To be fully developed upon completion of three phases, within the logistics center, there will be six operating zones, including port operation area, warehouse and distribution area, cold chain logistics area, rail cargo loading area, exhibition area and residential community. The logistics center is also expected to provide a number of shipping berths for cargo ships of various sizes. Wuhan Newport is expected to provide domestic and foreign businesses a direct access to the anticipated Free Trade Zone in Wuhan. The project will include commercial buildings, professional logistic supply chain centers, direct access to the Yangtze River, Wuhan-Xinjiang-Europe Railway and ground transportation, storage and processing centers, IT supporting services, among others.

*Id.* at ¶ 87.

Plaintiffs allege that Yangtze's representations "that it had assets of approximately $400 million, mostly in real estate properties and land lots under development" were misleading because, in reality, "Yangtze was not a firm capable of executing a major infrastructure project[]" and had no assets and no infrastructure project in development. *Id.* at ¶¶ 4-6. Plaintiffs further allege that Yangtze's representations that it was not involved in any legal proceedings that would harm its business were misleading because, by 2017, its Chinese subsidiary, Wuhan Newport, had been declared insolvent in China and had at least 11 judgments totaling $110 million against it. *Id.* at ¶¶ 10, 19.

With respect to Yangtze's developments, Plaintiffs allege that, while Yangtze "had repeatedly told investors that they intended to build the Port Logistics Center on 1.2 million square meters of land leased from" a Chinese rural village called Chunfeng Village, they had not leased the land, and in fact, Chunfeng Village does not even have 1.2 million square meters of land to lease. *Id.* at ¶ 8. Yangtze's representations that it partially had developed the Wuhan Centre China Grand Steel Market (the "Steel Market") also purportedly were misleading because the Steel Market "was a ghost town with no sign of activity." *Id.* at ¶ 9. Indeed, according to Plaintiffs, its investigators had visited Chunfeng Village and the Steel Market and discovered that the Port Logistics Center was not under development in Chunfeng Village and that the Steel Market had been empty since 2012. *Id.* at ¶¶ 9, 100, 152-53.

As to the Individual Defendants, Plaintiffs claim that they: (1) directly participated in the management of Yangtze; (2) were directly involved in Yangtze's day-to-day operations "at the highest levels"; (3) were "privy to confidential proprietary information concerning [Yangtze] and its business and operations"; (4) were "directly or indirectly involved in drafting, producing,

reviewing, and/or disseminating the false and misleading statements and information alleged" in the Amended Complaint; (5) were "directly or indirectly involved in the oversight or implementation of [Yangtze's] internal controls"; (6) were "aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning [Yangtze]"; and/or (7) "approved or ratified these statements in violation of the federal securities laws." *Id.* at ¶ 32(a)-(g).

## LEGAL STANDARDS

### I. Motion to Dismiss

To survive a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plausibility standard "does not require 'detailed factual allegations,' but it demands more than . . . unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

In deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court accepts as true all well pled factual allegations and draws all reasonable inferences in the plaintiff's favor. *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009) (citations omitted). Nevertheless, "threadbare recitals of the elements of a cause of action" that are supported by "conclusory" statements and mere speculation are inadequate and subject to dismissal. *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation marks and citation omitted); *See also*, *Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

### II. Securities Fraud Pleadings

A complaint alleging securities fraud under § 10(b) of the Securities Exchange Act is

subject to two heightened pleading standards. First, the complaint must satisfy Fed. R. Civ. P. 9(b), which requires that the complaint "state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b); *See also*, *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2015) (citations omitted). Second, the complaint must meet the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), which "insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)).

## DISCUSSION

Plaintiffs allege: (I) violations of § 10(b) of the Securities Exchange Act and Rule 10b-5 against all Defendants; and (II) violations of § 20(a) of the Securities Exchange Act against the Individual Defendants.

### I. Plaintiffs' § 10(b) and Rule 10b-5 Claim Against Defendants

Section 10(b) of the Securities Exchange Act makes it illegal "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance[.]" 15 U.S.C. § 78j(b). Rule 10b-5, promulgated thereunder, makes it unlawful for "any person, directly or indirectly . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]" 17 C.F.R. § 240.10b-5. To state a claim for relief under § 10(b) and Rule 10b-5, a plaintiff must allege: "(1) the defendant made a material misrepresentation or omission; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *IBEW Local Union No.*

*58 Pension Fund & Annuity Fund v. Royal Bank of Scotland Group, PLC*, 783 F.3d 383, 389 (2d Cir. 2015) (citation omitted).

Defendants move to dismiss on the grounds that Plaintiffs fail to plead adequately: (A) material misrepresentation or omission; (B) scienter; and (C) loss causation. For the reasons set forth below, the Court finds that: (1) Plaintiffs adequately plead material misrepresentations as to the Individual Defendants with respect to certain SEC filings and, as to Yangtze, with respect to all SEC filings, but fail to plead material misrepresentations with respect to the Press Release; (2) Plaintiffs adequately plead scienter as to Defendants Liu and Yangtze, but fail to plead scienter as to Defendants Zheng, Chan, Coleman, and Leibowitz; and (3) Plaintiffs adequately plead loss causation. Accordingly, Defendants' motion to dismiss is granted only with respect to Defendants Zheng, Chan, Coleman, and Leibowitz for failure to plead scienter, but denied as Defendants Liu and Yangtze with respect to material misrepresentations in the SEC filings.

### A. Material Misrepresentations or Omissions

As set forth above, Plaintiffs' § 10(b) claim is premised on purportedly false statements or omissions in Yangtze's 2015 to 2018 SEC filings and the Press Release. Plaintiffs allege that Yangtze's SEC filings were materially false and misleading because they reported that Yangtze had approximately $400 million in assets, mostly in real estate properties and land under development when, in reality, it had no land assets and no development projects in progress, and Yangtze was not involved in any litigation, even though its Chinese subsidiary, Wuhan Newport, was involved in numerous disputes, including a bankruptcy proceeding. *See*, Am. Compl. ¶¶ 4, 6, 54, 57-58, 60-61, 64-65, 67-68, 71-72, 74-75, 78-79, 81-82, 85-86, 90-91, 94-95, 97-98, 101-02, 106-07, 110-11, 115-16, 119-20, 124-25, 128-29, 133-34, 137-38, 142-43, 146-47. Plaintiffs further allege that Defendants' statements in the 2017 and 2018 SEC filings that Yangtze "may be

materially and adversely affected if [Wuhan Newport] declares bankruptcy or becomes subject to a dissolution or liquidation proceeding[]" were materially false because by July 13, 2017, Wuhan Newport "*had actually filed a bankruptcy petition*." *Id.* at ¶¶ 103-04, 112-13, 121-22, 130-31, 139-40, 148-49 (emphasis in original). As to the Press Release, Plaintiffs allege that it was materially false and misleading because it reported that Wuhan Newport was developing a "logistics center" with "six operating zones, including port operation area, warehouse and distribution area, cold chain logistics area, rail cargo loading area, exhibition area and residential community[,]" yet, Plaintiffs' investigator "confirmed that Wuhan Newport was not developing the Port Logistics Center." *Id.* at ¶¶ 87-88.

To satisfy Fed. R. Civ. P. 9(b) and the PSLRA's pleading requirements, a complaint based on misstatements "must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc.*, 493 F.3d at 99 (citation omitted). Whether a misrepresentation is material "depends on whether there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act[]" and, therefore, determining materiality "depends on all relevant circumstances." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (internal quotation marks, alterations, and citations omitted). A complaint may not be dismissed on the grounds that the alleged misrepresentations are not material, unless "they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* (internal quotation marks and citations omitted).

Defendants seek to dismiss the Amended Complaint for failure to allege material misrepresentations on the grounds that: (1) Plaintiffs' allegations with respect to the SEC filings

are not pled properly or, in the alternative, the SEC filings contain forward-looking statements, which are permitted under the PSLRA; and (2) Plaintiffs' allegations with respect to the Press Release are not pled properly and further, the Press Release contains permissible forward-looking statements. Def. Mem., 11-19.

1. Plaintiffs' Allegations Regarding Misrepresentations in Defendants' SEC Filings

Defendants contend that Plaintiffs' "bare allegation[s] of supposedly misleading financial statements alone" are insufficient because Plaintiffs fail to allege that the SEC fillings "are inconsistent with an applicable accounting standard or the industry standard." Def. Mem., 12-13. Where a § 10(b) claim is premised on valuation fraud, failure to allege that defendants violated a Generally Accepted Accounting Principle ("GAAP") or industry standard is fatal to the claim. *See*, *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp.3d 473, 488 (S.D.N.Y. 2017) (plaintiff's claim that defendants failed to disclose the amount of interest owed on the company's bonds fell "short of plausibly alleging a misstatement or omission[]" where plaintiff failed to allege violation of GAAP or industry standard); *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp.3d 155, 170-72 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016) (dismissing § 10(b) claim where plaintiff alleged that the losses reported in defendants' SEC filings were fraudulent misrepresentations because they did not match up with the aggregate insured losses that defendant's subsidiaries had reported to insurance regulators, but failed to allege that defendants' accounting methods violated GAAP).

Here, however, Plaintiffs are not alleging GAAP violations or accounting irregularities. Thus, Defendants' argument is without merit. Plaintiffs need not allege a GAAP violation to plead adequately that Defendants misrepresented existing facts regarding Yangtze's assets and relevant legal proceedings. *See*, *Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't*

*Holdings, Inc.*, 422 F. Supp.3d 821, 845 (S.D.N.Y. 2019) (plaintiffs' allegations regarding defendants' "concrete and measurable" updates on development of their product established "misrepresentation of existing facts[]") (internal quotation marks, citation, and alteration omitted). Moreover, Defendants' representations in the 2017 and 2018 SEC filings regarding the potential risk of liquidation proceedings are misleading for the additional reason that at the time they were made, Wuhan Newport already had declared bankruptcy and, thus, the disclosed potential risk had materialized. *See*, *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp.2d 487, 516 (S.D.N.Y. 2013) ("Courts in this Circuit have held that a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized.").

Defendants further argue that the SEC filings contain "forward-looking statements" and, therefore, fall within the PSLRA's "safe harbor." Def. Mem., 13-18. The PSLRA exempts defendants from liability for alleged misrepresentations or omissions where the statement at issue is "forward-looking." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 765 (2d Cir. 2010); 15 U.S.C. § 78u-5(c). Forward-looking statements are "statements whose accuracy can only be verified after they are made." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp.2d 512, 569 (S.D.N.Y. 2011), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) (citations omitted). By contrast, "statements about present or historical facts, whose accuracy can be determined at the time they were made, are not forward-looking statements[.]" *Id.* (citations omitted). For a forward-looking statement to fall within the PSLRA's safe harbor, one of three criteria must be met: (1) the statement must be "identified as a forward-looking statement[] and [be] accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"; or (2) the statement must be

immaterial; or (3) the plaintiff fails to prove that the statement was made with actual knowledge that it was false or misleading.  15 U.S.C. § 78u-5(c); *Slayton*, 604 F.3d at 765-66 (citations omitted).

Defendants contend that the SEC filings fall within the PSLRA's safe harbor because each 10-K and 10-Q upon which Plaintiffs premise their claim contains a paragraph titled "Forward-Looking Statements," which notes that "forward-looking statements are found at various places through [each 10-K and 10-Q] and include information concerning possible or assumed future results of [Yangtze's] operations; business strategies; future cash flows; financing plans; plans and objectives of management; any other statements regarding future operations, future cash needs, business plans and future financial results, and any other statements that are not historical facts." Def. Mem., 15-16; *See also, e.g.*, Phillipson Decl., Ex. B, at 3 (2015 10-K); Phillipson Decl., Ex. E, at 3 (2016 Q2 10-Q); Phillipson Decl., Ex. F, at 3 (2016 Q3 10-Q); Phillipson Decl., Ex. G, at 3 (2016 10-K).  Defendants further note that each 10-K and 10-Q contains forward-looking language, including "is expected" and "is believed."  Def. Mem., 14-15.

Defendants' characterization of each SEC filing as entirely forward-looking is misguided. Rather, the SEC filings contain a combination of forward-looking statements and statements of present or historical facts.  For instance, the present fact that "Wuhan Newport has signed an agreement to rent 1.2 million square meters of land on a long term basis for building logistics warehouses covering 400,000 square meters in support of the new port[]" is followed immediately by the forward-looking statement "The warehouses [are] expected to comprise of port terminal zones, warehouse logistics zones, cold chain supply zones and railroad loading and unloading zones."  Am. Compl. ¶ 55.

The SEC filings are replete with statements of historical or present facts that immediately

are preceded or followed by forward-looking statements. The 2015 10-K contains present and historical facts, such as: (1) "One of the main projects of [Yangtze] is [the Port Logistics Center], which is an extensive complex that is located in Wuhan . . ."; (2) "Wuhan Newport has obtained the land use rights to own approximately 500,000 square meters of commercial lands . . ."; and (3) "As of the date of this Annual Report, mixed-use complex totaling approximately 100,000 square meters have been completed[.]" *Id.* The same 2015 10-K also contains forward-looking statements, such as: "The warehouses, once constructed will connect the port terminal along the Yangtze River and the railway leading to Europe, satisfying the requirement of China's latest 'One Belt, One Road' initiative." *Id.*

Similarly, the 2016, 2017, and 2018 10-Qs contain statements of historical and present fact, such as: (1) "Our [Port] Logistics Center is an extensive complex located in Wuhan . . ."; (2) "Wuhan Newport has signed a twenty-year lease agreement . . . to lease approximately 1,200,000 square meters of land for building logistics warehouses in support of the [Port] Logistics Center."; and (3) "[T]he sole developing project is called [the Steel Market] with approximately 222,496.6 square meters of total construction area." *Id.* at ¶¶ 62, 69, 76, 92, 99, 108, 126, 135, 144. These 10-Qs also contain forward-looking statements, such as: (1) "Wuhan Newport is expected to provide domestic and foreign businesses a direct access to the anticipated Free Trade Zone in Wuhan. The project will include commercial buildings, professional logistic supply chain centers, direct access to the Yangtze River . . . among others."; and (2) "The [Port] Logistics Center is expected to occupy approximately 1,918,000 square meters[.]" *Id.*

Where a statement contains elements that are forward-looking and elements that are not forward-looking, "the forward-looking elements and the non-forward-looking are severable." *Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 144 (2d Cir. 2010). Defendants

cannot escape liability merely by including forward-looking statements alongside statements of historical and present facts. *See*, *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language."); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp.2d at 569 (noting that the PSLRA "does not protect statements which are misleading about historical and present facts at the time they are made, and whose misleading nature can be verified at the time they are made, simply because the statements are couched as predictions of future events[]") (citation omitted).

Accordingly, Plaintiffs adequately plead misrepresentations in the SEC filings. Moreover, these misrepresentations are material as there is a substantial likelihood that reasonable shareholders would have considered information about Yangtze's assets and Wuhan Newport's bankruptcy important in deciding how to act.

## 2. Plaintiffs' Allegations Regarding Misrepresentations in the Press Release

Defendants first contend that the Press Release was not misleading because it "*never* mentions the 'Port Logistics Center[.]'" Def. Mem., 18 (emphasis in original). This argument is disingenuous. The Press Release does not use the name "Port Logistics Center," yet its description of a "port logistic project located in the middle reaches of the Yangtze River[,]" and a "logistics center . . . [with] six operating zones, including port operation area, warehouse and distribution area, cold chain logistics area, rail cargo loading area, exhibition area and residential community[,]" Am. Compl. ¶ 87, is nearly identical to the description of the Port Logistics Center contained in the SEC filings. *See, e.g.*, *Id.* at ¶ 55 (2015 10-K describing "River Newport Logistics Center" as comprising of "port terminal zones, warehouse logistics zones, cold chain supply zones and railroad loading and unloading zones[]"); *Id.* at ¶ 62 (2016 Q1 10-Q describing "logistics

center" "[s]ituated in the middle reaches of the Yangtze River . . . [with] six operating zones: including port operation area, warehouse and distribution area, cold chain logistics area, rail cargo loading area, exhibition area and business related area[]").

Defendants further assert that the Press Release is exempted under the PSLRA's safe harbor because it contains forward-looking statements and contains a section entitled "Forward-Looking Statement" with cautionary language. Def. Mem., 18. Unlike the SEC filings, which contained a combination of forward-looking statements and statements of present and historical facts, the Press Release contains only forward-looking statements about what the Port Logistics Center is "expected to provide" upon its completion. *See*, Am. Compl. ¶ 87. Accordingly, Defendants are exempted from liability for the purported misrepresentations in the Press Release.

### 3. Responsibility for Misstatements in the SEC Filings

Having concluded that the SEC filings contained material misstatements, the Court must determine which Defendants may be held responsible for these misstatements. Plaintiffs allege that Yangtze filed the SEC statements and that the Individual Defendants were "directly involved in the day-to-day operations of [Yangtze] at the highest levels . . . [and were] directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements." *Id.* at ¶¶ 32(b), (d), 53, 59, 66, 73, 80, 89, 96, 105, 114, 123, 132, 141. Moreover, Plaintiffs allege that: (1) the 2015 and 2016 10-Ks were signed by Defendants Liu, Zheng, Coleman, and Leibowitz; (2) the 2017 10-K was signed by Defendants Liu, Chan, Coleman, and Leibowitz; and (3) the 2018 10-Qs were signed by Defendants Liu and Chan. *Id.* at ¶¶ 53, 80, 114, 123, 132, 141. With respect to the 2016 and 2017 10-Qs, Plaintiffs do not allege that they were signed by any of the Individual Defendants. *Id.* at ¶¶ 59, 66, 73, 89, 96, 105.

Generally, "where there are multiple defendants, the complaint must allege that each

particular defendant 'made the material misstatements.'" *Das v. Rio Tinto PLC*, 332 F. Supp.3d 786, 805 (S.D.N.Y. 2018) (quoting *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011)). Accordingly, based on Plaintiffs' allegations, Yangtze may be held responsible for the misstatements in all of the SEC filings. Moreover, the Individual Defendants may be held liable for the misrepresentations contained within the SEC filings that they signed. Namely, Defendants Liu, Coleman, and Leibowitz may be held responsible for the statements within the 2015, 2016, and 2017 10-Ks, Defendant Zheng may be held responsible for the statements within the 2015 and 2016 10-Ks, Defendant Chan may be held responsible for the statements within the 2017 10-K, and Defendants Liu and Chan may be held responsible for the statements within the 2018 10-Qs. *See*, *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp.2d 152, 163-64 (S.D.N.Y. 2012) ("[C]ourts consistently hold that signatories of misleading documents 'made' the statements in those documents, and so face liability under Rule 10b-5(b).") (citations omitted).

To hold the Individual Defendants responsible for the misleading statements in the SEC filings that they did not sign, the Court would need to rely on the group pleading doctrine. *See*, *Id.* at 165 (holding that defendant was not liable for misleading statements in SEC filings that he did not sign because he did not "make" the statements they contained). Pursuant to the "group pleading doctrine," courts may presume that "group-published documents such as statements in prospectuses, registration statements, annual reports, [and] press releases are attributable to individuals with direct involvement in the everyday business of the company." *ICD Capital, LLC v. CodeSmart Holdings, Inc.*, 2020 WL 815733, at *5 (S.D.N.Y. Feb. 19, 2020) (internal quotation marks and citation omitted).

As an initial matter, the Court notes that there is a split among courts in the Second Circuit as to whether the group pleading doctrine remains viable after the Supreme Court's decision in

*Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011). There, the Court concluded that a mutual fund investment adviser could not be held liable under Rule 10b-5 for false statements contained in its client's mutual fund prospectuses, even though the investment adviser was involved in preparing (though not signing) the prospectuses. *Id.* In reaching this conclusion, the Court analyzed the terms contained in Rule 10b-5 as defined in various dictionaries and explained that "[o]ne 'makes' a statement by stating it." *Id.* at 142. Thus, the Court adopted a new rule, announcing that "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.*

Since *Janus Capital*, the Second Circuit Court of Appeals has not addressed squarely whether the group pleading doctrine remains viable. Accordingly, courts in this Circuit have reached opposing conclusions regarding *Janus Capital's* impact, with some concluding that the group pleading doctrine has been abrogated by *Janus Capital* and others finding that it is not incompatible with *Janus Capital*. *Compare*, *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at \*10 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) ("[A] theory of liability premised on treating corporate insiders as a group cannot survive a plain reading of the *Janus* decision[.]") (citing cases) *with*, *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp.2d 359, 374 (S.D.N.Y. 2012) ("As for *Janus Capital*, that case addressed only whether third parties can be held liable for statements made by their clients. Its logic rested on the distinction between secondary liability and primary liability . . . and has no bearing on how corporate officers who work together in the same entity can be held jointly responsible on a theory of primary liability. It is not inconsistent with *Janus Capital* to presume that multiple people in a single corporation have the joint authority to make an SEC filing, such that a misstatement has more than one maker.")

(internal quotation marks and citations omitted).

Even assuming that the group pleading doctrine remains viable post-*Janus Capital*, Plaintiffs have failed to allege facts that give rise to an inference that the Individual Defendants were involved in Yangtze's day-to-day operations such that the group pleading doctrine would apply to them. Plaintiffs allege that the Individual Defendants were "directly involved" in managing Yangtze and disseminating the misleading SEC filings. Am. Compl. ¶ 32(a)-(b), (d). Such allegations are conclusory and insufficient to establish the Individual Defendants' liability. *See*, *In re Braskem S.A. Sec. Litig.*, 246 F. Supp.3d 731, 762, n.10 (S.D.N.Y. 2017) (allegations that each of the individual defendants, including company's CEO, "had direct involvement in the day-to-day operations of the [c]ompany[,]" were provided with copies of purportedly misleading statements, and "had the ability to prevent" their dissemination were conclusory and insufficient to hold company's CEO liable under group pleading doctrine); *Cf.*, *Levy v. Maggiore*, 48 F. Supp.3d 428, 449-50 (E.D.N.Y. 2014) (allegations that company's private placement memorandum listed individual defendant as company's CEO and "invite[d] readers to contact him to ask questions and obtain additional information[]" and that individual defendant was involved in company meeting relevant to underlying action supported finding that the individual defendant "had direct involvement in the everyday business of the company[]" and, therefore, could be held liable for misleading statements under the group pleading doctrine) (internal quotation marks and citations omitted). Accordingly, the Individual Defendants may not be held liable for the purportedly misleading statements in the SEC filings that they did not sign.

### B. Scienter

Defendants contend that Plaintiffs do not plead scienter. Def. Mem., 19-22; Def. Reply, 5-7. To plead scienter, a plaintiff must allege "with particularity facts giving rise to a *strong*

inference that the defendant acted with the required state of mind." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago*, 553 F.3d at 198 (internal quotation marks and citation omitted) (emphasis in original). The requisite state of mind is an "intent 'to deceive, manipulate, or defraud.'" *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)). A "strong inference" is one that is "'more than merely plausible or reasonable'" but rather, "'cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *Id.* (quoting *Tellabs, Inc.*, 551 U.S. at 314).

A plaintiff may establish a strong inference of scienter by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc.*, 493 F.3d at 99 (citation omitted). When the defendant is a corporate entity, a plaintiff can show corporate scienter "by pleading facts sufficient to create a strong inference either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (internal quotation marks and citation omitted).

1. <u>Defendant Liu</u>

Plaintiffs contend that they sufficiently allege motive and opportunity as to Defendant Liu, Yangtze's CEO. Pl. Opp'n, 20. To allege "motive and opportunity" to defraud, a complaint must allege facts showing that the defendant "benefitted in some concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000). However, "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not

21

constitute 'motive' for purposes of this inquiry." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago*, 553 F.3d at 198 (citations omitted). While a "generalized desire to maintain a higher stock price" is insufficient to establish motive, allegations of "the artificial inflation of a stock price in order to achieve some more specific goal may satisfy the pleading requirement." *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp.2d 314, 328 (S.D.N.Y. 2001) (citing *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 270 (2d Cir. 1993)).

Plaintiffs allege that Liu claimed to have made advances to Yangtze and then used the proceeds that Yangtze made from capital raises to repay himself for these purported advances. Am. Compl. ¶¶ 5, 11. This allegation of Liu's specific goal of collecting Yangtze's proceeds as repayment for loans that he never actually made establishes motive as it shows that Liu benefited in a concrete way from inflating Yangtze's stock prices. *See*, *Meyer v. Concordia Int'l Corp.*, 2017 WL 4083603, at *6 (S.D.N.Y. July 28, 2017) (allegation that defendants had been motivated to inflate their company stock prices to effectuate an acquisition of the company that would not have otherwise been possible was sufficient to establish motive) (citations omitted); *Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp.2d 435, 455 (S.D.N.Y. 2007) (plaintiffs adequately pled motive by alleging that defendants sought to avoid paying existing liabilities); *Turkish v. Kasenetz*, 27 F.3d 23, 28 (2d Cir. 1994) (plaintiffs pled motive by alleging that defendants sought to avoid repaying loans). Accordingly, Plaintiffs have pled scienter adequately as to Defendant Liu.

## 2. Defendants Zheng, Chan, Coleman, and Leibowitz

Plaintiffs do not allege motive as to Defendants Zheng, Chan, Coleman, and Leibowitz. Accordingly, to plead scienter with respect to them, Plaintiffs must plead circumstantial evidence of their "conscious misbehavior or recklessness." A plaintiff seeking to establish scienter by

pleading "conscious misbehavior or recklessness" must show that the alleged conduct is "highly unreasonable" and "represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Novak*, 216 F.3d at 308 (internal quotation marks and citation omitted). Generally, specific allegations of the defendants' "knowledge of facts or access to information contradicting their public statements[]" are sufficient to establish the defendants' conscious misbehavior. *Id.* Similarly, allegations of the defendants' engagement in "deliberately illegal behavior" or failure "'to check information they had a duty to monitor[]'" establish conscious misbehavior. *ECA, Local 134 IBEW Joint Pension Tr. of Chicago*, 553 F.3d at 199 (quoting *Novak*, 216 F.3d at 311).

Plaintiffs allege that Defendants Zheng, Chan, Coleman, and Leibowitz signed certain SEC filings and that Defendants Zheng and Chan signed Sarbanes–Oxley certifications attesting to the accuracy of the 10-Qs. Am. Compl. ¶¶ 59, 66, 73, 89, 96, 105, 123, 132, 141. However, signatures on a group-published document do "not compel a conclusion that all of the signatories were aware that it was misleading." *In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp.2d 452, 485 (S.D.N.Y. 2006); *See also*, *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp.2d 247, 304 (S.D.N.Y. 2008) (holding that individual's signature on SEC filings and Sarbanes–Oxley certifications did not give rise to strong inference of scienter). Indeed, "[t]o hold otherwise would allow plaintiffs to plead the scienter of whole classes of defendants solely by alleging a misstatement." *In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp.2d at 485.

Plaintiffs contend that the Amended Complaint raises a strong inference that the Individual Defendants made statements that they knew or should have known were false and that the Individual Defendants had a duty to ensure that Yangtze's purported assets, including the Port

Logistics Center, actually existed. Pl. Opp'n, 19. However, Plaintiffs fail to allege the existence of information from which the Individual Defendants could have discovered the falsity of the allegedly misleading statements in the SEC filings. Accordingly, Plaintiffs fail to raise an inference of scienter based on knowledge of information contrary to the SEC filings or duty to monitor. *See*, *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (finding no inference of scienter based on knowledge or duty to monitor, where plaintiff failed to identify information to which defendants had access that contradicted purportedly misleading statements).

Plaintiffs further assert that they adequately pled scienter under the core operations doctrine. Pl. Opp'n, 19-20. Pursuant to the core operations doctrine, "a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of income." *Hawaii Structural Ironworkers Pension Tr. Fund*, 422 F. Supp.3d at 852 (internal quotation marks and citation omitted). Although the Second Circuit has not addressed whether this doctrine survives the passage of the PSLRA, it has commented "that the doctrine can 'provide supplemental support for allegations of scienter, even if [it] cannot establish scienter independently.'" *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp.3d 459, 474 (S.D.N.Y. 2017) (quoting *New Orleans Emps. Ret. Sys. v. Celestica, Inc.,* 455 Fed. Appx. 10, 14 n.3 (2d Cir. 2011) (summary order)).

Here, Plaintiffs allege, and Defendants' SEC filings represent, that the Port Logistics Center and the Steel Market were core operations of Yangtze's business. *See*, *e.g.*, Am. Compl. ¶ 55 (2015 10-K describing Port Logistics Center as "[o]ne of the main projects of . . . [Yangtze]" and the Steel Market as Yangtze's "sole developing project"). However, the core operations doctrine is "insufficient by itself to support strong circumstantial evidence of scienter." *City of*

*Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 2020 WL 1529371, at *28 (S.D.N.Y. Mar. 30, 2020) (citation omitted).  Absent allegations that independently give rise to a strong inference of scienter, such as allegations that Defendants Zheng, Chan, Coleman, and Leibowitz knew or should have known that the SEC filings contained false statements, Plaintiffs cannot rely on the core operations doctrine to establish scienter.  *See*, *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp.2d 323, 343 (S.D.N.Y. 2011) ("[T]he core operations doctrine bolsters the strength of the inference of scienter when plaintiff has already adequately alleged facts indicating that defendants might have known their statements were false.") (internal quotation marks and citations omitted).

For the foregoing reasons, the Court finds that Plaintiffs failed to plead scienter as to Defendants Zheng, Chan, Coleman, and Leibowitz.  Accordingly, Defendants' motion to dismiss with respect to these Individual Defendants is granted.

### 3. Corporate Scienter as to Yangtze

Plaintiffs allege facts that raise a strong inference of corporate scienter.  Generally, the "most straightforward" way to raise an inference of scienter against a corporate defendant is to plead scienter for an individual whose mental state is attributable to the corporation.  *Teamsters Local 445 Freight Div. Pension Fund*, 531 F.3d at 195.  However, a plaintiff may raise an inference of scienter for a corporate defendant, even if he fails to plead scienter as to the specific individual or individuals who perpetuated the fraud, "where, for example, a corporation issues a statement 'so dramatic' that it would necessarily 'have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false[.]'"  *Rex & Roberta Ling Living Tr. u/a Dec. 6, 1990 v. B Commc'ns Ltd.*, 346 F. Supp.3d 389, 406 (S.D.N.Y. 2018) (quoting *Teamsters Local 445 Freight Div. Pension Fund*, 531 F.3d at 195-96).

Here, because Plaintiffs have pled Liu's scienter, his state of mind is imputed to Yangtze. *See*, *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp.2d at 543 ("When the defendant is a corporate entity, the law imputes the state of mind of the employees or agents who made the statement(s) to the corporation.") (citation omitted). However, even if Plaintiffs had not pled Liu's scienter adequately, they nonetheless would succeed in pleading corporate scienter.

Significantly, Yangtze's representations in its SEC filings that it had approximately $400 million in assets are drastically different than the representations its subsidiary made to the Chinese court where it declared bankruptcy and, thus, are sufficient to demonstrate corporate scienter. *See*, *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp.2d 105, 126 (S.D.N.Y. 2013) (finding allegation that defendant had reported "drastically different income and revenue figures with the [Securities and Exchange Committee] and the [Chinese Administration of Industry and Commerce]" sufficient to allege corporate scienter) (citations omitted); *See also*, *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp.3d 266, 276 (S.D.N.Y. 2014) (noting that allegations concerning discrepancies between Chinese filings and SEC filings marginally increased the inference of corporate scienter). Moreover, Plaintiffs' allegations that its investigators visited Chunfeng Village and the Steel Market and discovered that the Port Logistics Center was not under development in Chunfeng Village and that the Steel Market had been empty since 2012, are "red flags that contribute to support a reasonable finding of scienter." *See*, *McIntire*, 927 F. Supp.2d at 126-27 (finding that plaintiffs had pled a number of "red flags" that raised finding of corporate scienter where plaintiffs alleged, among other things, that investigators had visited defendants' facilities and found no employees working there) (citations omitted). Accordingly, Plaintiffs have pled scienter adequately as to Yangtze.

### C. Loss Causation

Defendants contend that Plaintiffs fail to allege loss causation plausibly. "Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *17 (E.D.N.Y. May 20, 2020) (internal quotation marks and citation omitted). To establish loss causation, a plaintiff must allege "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 74 (2d Cir. 2013) (internal quotation marks and citation omitted) (emphasis in original). Loss causation may be established "*either* by alleging (a) the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud; or (b) . . . that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014) (internal quotation marks and citations omitted) (emphasis in original).

According to Defendants, it is unclear whether Plaintiffs are relying on a corrective disclosure theory or a materialization of risk theory. Def. Mem., 5. They conclude that "[i]t appears most likely Plaintiff[s] rel[y] on the materialization of risk method since (a) Plaintiff[s] do[] not allege that any corrective disclosures were made, and (b) Plaintiff[s] rel[y] heavily, if not entirely, on [t]he Hindenburg Report and its revelations of information allegedly contrary to that contained in [Yangtze's SEC filings]." *Id.* at 5-6 (internal quotation marks omitted). They then assert various arguments as to why Plaintiffs fail to plead loss causation based on a materialization of risk theory. *Id.* at 5-8. However, the Court need not address these arguments because Plaintiffs

assert, and the Amended Complaint makes clear,[1] that they are relying on a corrective disclosure theory.  Pl. Opp'n, 22.

To allege corrective disclosure, a plaintiff must "allege a disclosure of the fraud by which the available public information regarding the company's financial condition was corrected . . . and that the market reacted negatively to the corrective disclosure."  *Carpenters Pension Tr. Fund of St. Louis*, 750 F.3d at 233 (internal quotation marks, citations, and alteration omitted).  A corrective disclosure need not "emanate from the company itself," nor must it "take a particular form or be of a particular quality."  *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp.2d 277, 289 (S.D.N.Y. 2008) (internal quotation marks and citations omitted).  However, it must "possess a sufficient nexus to a prior misstatement such that it reveals at least part of the falsity of that misstatement."  *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp.2d at 283 (citations omitted).

Here, Plaintiffs allege that the December 6, 2018 Hindenburg Report revealed that the Port Logistics Center "was essentially a sham[,] . . . nearly 80% of [Yangtze's] reported assets were fabricated[,]" the Steel Market was "a ghost town," Yangtze was involved in numerous undisclosed legal proceedings, and Wuhan Newport had been declared insolvent in China.  Am. Compl. ¶¶ 151-54.  The price of Yangtze shares on December 4, 2018, the last trading day before publication of the Hindenburg Report, was allegedly $11.62 per share.  *Id.* at ¶ 157.  By December 7, 2018, one day after publication, share prices purportedly fell to $8.28 per share.  *Id.*  Thus, within two trading days, Yangtze's stock price fell nearly 29 percent.  *Id.*

The Hindenburg Report is directly linked to Defendants' prior statements in their SEC

---

[1] To the extent Defendants argue that the Hindenburg Report cannot be a corrective disclosure because Plaintiffs did not use the term "corrective disclosure" in the Amended Complaint, this argument lacks merit in light of Plaintiffs' factual allegations regarding the Hindenburg Report.  Def. Reply, 2 n.2.

filings. Specifically, the Hindenburg Report states, *inter alia*, that: (1) "conversations with officials" from Chunfeng Village revealed that Yangtze had not leased any land from them, contradicting statements in the SEC filings that Wuhan Newport had signed an agreement to rent 1.2 million square meters of land; (2) "Chinese court records show[] that [Yangtze] has at least 11 judgments filed against [it]" totaling $110 million, contradicting statements in the SEC filings that Yangtze was not involved in any litigation that could affect its business operations; and (3) "local court records show[] that creditors were unable to locate assets . . . [and] [t]he Chinese court has recently taken the extraordinary step of placing [Yangtze] on its list of 'untrustworthy debtors' due to its mass of unpaid judgments[,]" contradicting statements in the SEC filings that Yangtze had total assets of approximately $400 million. Am. Compl., Ex. A ("Hindenburg Report"), 3-4.[2] Thus, the Hindenburg Report possesses a "sufficient nexus" to the misstatements in the SEC filings to form an adequate basis for Plaintiffs' loss causation allegations. *See*, *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp.2d at 283, 286-90 (holding that plaintiffs adequately alleged loss causation where corrective disclosure was linked to defendant's earlier misrepresentations).

Defendants argue that Plaintiffs cannot plead loss causation by relying on the Hindenburg Report because the authors of the Hindenburg Report "'ha[d] a short position in all stocks covered [within the Hindenburg Report], and therefore [stood] to realize significant gains in the event that the price of any stock covered [therein] decline[d].'" Def. Mem., 9 (quoting Hindenburg Report, 18); Def. Reply, 1 (noting that the authors of the Hindenburg Report "were motivated to cause a decline in share value[]"). This argument is without merit because a short seller's[3] report can

---

[2] The pages in the Hindenburg Report are not numbered, and, therefore, the Court's citations are to the page numbers that appear in the Portable Document Format ("PDF") bar when the document is opened in Electronic Case Files ("ECF").

[3] A short seller "speculates that a particular stock will go down in price and seeks to profit from that drop." *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 700 (2d Cir. 1998).

constitute a corrective disclosure, if the report reveals accurate information about a company that exposes actual misstatements by the company. *See, e.g.*, *In re Winstar Commc'ns*, 2006 WL 473885, at *14-15 (S.D.N.Y. Feb. 27, 2006) (plaintiffs adequately alleged loss causation based on a report by a short seller that the company had insufficient cash flow to fund its operations and likely would default on its credit obligations); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2019 WL 5287980, at *30 (S.D.N.Y. Oct. 18, 2019), *report and recommendation adopted in part*, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) (noting that the fact that a report was published by a short seller "is not an absolute bar to the [r]eport serving as a corrective disclosure[]").

Next, Defendants dispute that the Hindenburg Report reveals accurate information about Yangtze and ask the Court to take judicial notice of their lawsuit against its authors "for publishing false and malicious representations concerning [Yangtze]." Def. Reply, 3-4. While the Court may take judicial notice of the fact that Defendants have filed a complaint against Hindenburg Research, it will not consider the veracity of Defendants' claims against Hindenburg Research. *See*, *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.") (internal quotation marks and citation omitted). Whether the Hindenburg Report, in fact, contained false information is a factual dispute that cannot be resolved at the motion to dismiss stage. *See*, *McIntire*, 927 F. Supp.2d at 124 (noting that truth of a short seller's report is a factual issue not appropriate for resolution on a motion to dismiss) (citations omitted). Moreover, the veracity of the Hindenburg Report is of no consequence at this juncture, as loss causation may "be grounded in disclosure couched as opinions, or in other statements that are not verifiably truthful at the time they are made." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp.2d at 283 (internal quotation

marks and citation omitted). Accordingly, for purposes of this decision, the Court accepts Plaintiffs' allegations regarding the Hindenburg Report as true.

Defendants further contend that the Hindenburg Report represents nothing more than its authors' opinions and, therefore, cannot constitute a corrective disclosure. Def. Mem., 11. In support of this argument, Defendants rely on *Zhong Zheng v. Pingtan Marine Enterprise Ltd.*, 379 F. Supp.3d 164 (E.D.N.Y. 2019), *appeal dismissed* (2d Cir. 2019), where this Court found that an article espousing opinions about the value of the defendant company's shares was not a corrective disclosure and dismissed the plaintiff's § 10(b) claim for, *inter alia*, failure to plead loss causation. However, *Zhong Zheng* is inapposite. There, the article that the plaintiff alleged to be a corrective disclosure "did not reveal any undisclosed information[]" but rather "relied on public information and merely represented the author's opinion" of the defendant company's value. *Id.* at 178. Indeed, the article in *Zhong Zheng* drew conclusions based, in part, on the defendant company's SEC filings. *Id.* By contrast, the Hindenburg Report reveals information that contradicts representations Defendants made in their SEC filings, as set forth above. Third-party analyses of a company that "contradict representations made by defendants[,]" such as the Hindenburg Report, can form an adequate basis for loss causation. *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp.2d at 283 (citation omitted).

In light of the foregoing, the Court finds that Plaintiffs have alleged loss causation adequately, as it is plausible to infer that the Hindenburg Report revealed to the market some part of the relevant truth concerning Yangtze, thereby causing a 29 percent decline in its share price. Accordingly, Defendants' motion to dismiss is denied with respect to Defendants Liu and Yangtze.

## II. Plaintiffs' § 20(a) Claim Against the Individual Defendants

Plaintiffs seek to impose liability against the Individual Defendants pursuant to § 20(a) of

the Securities Exchange Act in their capacities as controlling persons of Yangtze. Am. Compl. ¶¶ 181-82. Plaintiffs allege that the Individual Defendants held "positions of control and authority as senior officers[]" within Yangtze, which imparted upon them a "duty to disseminate accurate and truthful information with respect to Yangtze's financial condition and results of operations, and to correct promptly any public statements issued by Yangtze which had become materially false or misleading." *Id.* at ¶¶ 179-81. According to Plaintiffs, throughout the punitive class period, the Individual Defendants "exercised their power and authority to cause Yangtze to engage in . . . wrongful acts." *Id.* at ¶ 181.

> Section 20(a) provides:
>
> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

To state a claim under § 20(a), a plaintiff must allege: "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis*, 750 F.3d at 236 (internal quotation marks and citation omitted). To plead control of the primary violator, "[i]t is not sufficient for a plaintiff to allege that an individual defendant has control person *status*; instead, the plaintiff must assert that the defendant exercised *actual* control over the matters at issue." *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp.2d 148, 170 (S.D.N.Y. 2008) (citation omitted) (emphasis in original). The power to direct the management and policies of the primary violator "must be a real, de facto power and not just de jure[,]" and, thus, "officer or director status alone does not constitute

control." *In re Glob. Crossing, Ltd. Sec. Litig.*, 2005 WL 1907005, at *12 (S.D.N.Y. Aug. 8, 2005) (internal quotation marks and citations omitted). In addition to the requirement of control, a plaintiff must allege that the controlling person was a "culpable participant" in the primary violation, and the plaintiff must "plead with particularity facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct." *Id.* (internal quotation marks and citation omitted).

Plaintiffs satisfy the first two elements of a § 20(a) claim. As discussed above, Plaintiffs have stated a § 10(b) claim against Yangtze. Plaintiffs also adequately allege that the Individual Defendants exercised control over Yangtze. Courts have held that control is pled adequately where an officer or director has signed SEC filings. *See*, *In re Alstom SA*, 406 F. Supp.2d 433, 487-88 (S.D.N.Y. 2005) (citing cases); *See also*, *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 669 (S.D.N.Y. 2017) ("[C]orporate officers usually are presumed to possess the ability to control the actions of their employees, and directors and officers who sign registration statements or other SEC filings are presumed to control those who draft those documents.") (internal quotation marks and citation omitted). As set forth above, the Individual Defendants held and/or hold positions as officers and directors of Yangtze and each of the Individual Defendants signed at least one of the purportedly misleading SEC filings at issue in this case.

With respect to the third element, Plaintiffs adequately allege "culpable participation" only as to Defendant Liu. Culpable participation "must be pleaded with the same particularity as scienter[,]" meaning "that an allegation of culpable participation requires particularized facts of the *controlling person's* conscious misbehavior or recklessness." *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp.3d 401, 438 (S.D.N.Y. 2014) (internal

quotation marks and citations omitted) (emphasis in original). As discussed above, Plaintiffs have pled facts sufficient to support a finding of scienter as to Defendant Liu, but failed to do so as to Defendants Zheng, Chan, Coleman, and Leibowitz. Accordingly, Plaintiffs' § 20(a) claim against Defendants Zheng, Chan, Coleman, and Leibowitz is dismissed. *See*, *In re Glob. Crossing, Ltd. Sec. Litig.*, 2005 WL 1907005, at *12 ("A complaint that does not contain detailed allegations regarding the state of mind of the control person must be dismissed.") (internal quotation marks and citations omitted). However, Plaintiffs' claim as to Defendant Liu survives. *See*, *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp.3d 222, 254 (S.D.N.Y. 2018) (finding that plaintiffs "necessarily pled facts sufficient to support culpable participation" where they had pled facts sufficient to support an inference of scienter).

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss Plaintiffs' § 10(b) claim is granted as to Defendants Zheng, Chan, Coleman, and Leibowitz and denied as to Defendants Liu and Yangtze, and Defendants' motion to dismiss Plaintiffs' § 20(a) claim against the Individual Defendants is granted with respect to Defendants Zheng, Chan, Coleman, and Leibowitz and denied as to Defendant Liu. Accordingly, Plaintiffs' § 10(b) and § 20(a) claims against Defendants Zheng, Chan, Coleman, and Leibowitz are dismissed with prejudice.

SO ORDERED.

Dated: Brooklyn, New York
          June 28, 2021

/s/
_____
DORA L. IRIZARRY
United States District Judge
